IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

                          **Plaintiff**,

v.                                                    Case No. 22-20032-01-DDC

**ERNEST LUCAS (01)**,

                          **Defendant**.

## MEMORANDUM AND ORDER

Defendant Ernest Lucas filed a Motion for *Franks* Hearing and to Suppress Evidence (Doc. 105). Mr. Lucas asks the court to suppress two kinds of evidence. First, he seeks to suppress footage from a pole camera that police officers installed on a utility pole outside Mr. Lucas's home. Second, he seeks to suppress evidence secured through a warranted search of that same home. Mr. Lucas also asks the court to conduct a *Franks* hearing, by which the court may exclude evidence discovered under a search warrant if the affiant "'knowingly or recklessly included false statements in or omitted material information from'" a supporting affidavit. *United States v. Smith*, 846 F. App'x 641, 648 (10th Cir. 2021) (quoting *United States v. Campbell*, 603 F.3d 1218, 1228 (10th Cir. 2010)). Mr. Lucas's requests are highly interrelated. His motion to suppress the evidence secured through the house search and his motion for a *Franks* hearing both depend on the successful suppression of the pole camera footage. Because this interrelatedness is crucial to the court's holding, the court explains it more comprehensively, below.

Mr. Lucas first argues that the court should suppress the pole camera footage because the pole camera surveillance constituted an unwarranted search violating Mr. Lucas's Fourth Amendment rights. If the court suppresses that footage, then, Mr. Lucas contends, the court must excise any references to the footage from a warrant affidavit. That affidavit supported law enforcement's application to search Mr. Lucas's home. In its excised form, he claims the affidavit fails to support probable cause. So, premised on this excised affidavit, Mr. Lucas also asks the court to suppress evidence secured through the search warrant's execution on Mr. Lucas's home. And, Mr. Lucas asks the court to conduct a *Franks* hearing. He contends the warrant's limited remaining information—after the court excises the pole camera footage—contained false statements or omissions that justify a *Franks* hearing.

The government disagrees. It contends there's no need to suppress any evidence and no need for a *Franks* hearing. The government also asserts that, in any event, the good faith exception applies. So, even if a constitutional violation occurred, the court shouldn't suppress the evidence secured by the warranted search.

This Order denies the Motion for *Franks* Hearing and to Suppress Evidence (Doc. 105). Under Tenth Circuit precedent, the pole camera surveillance doesn't amount to a search. So, the court declines to suppress the pole camera footage. Mr. Lucas relies on the pole camera footage's suppression to excise the affidavit. Without the affidavit excised, the court concludes there's no reason to suppress the evidence from the search of Mr. Lucas's home or to conduct a *Franks* hearing. So, this Order denies the motion in full. The court needn't reach the government's good faith exception argument.

This Order explains these decisions, *first*, by reciting the background facts. *Second*, the Order evaluates the alleged Fourth Amendment violation arising from the pole camera

surveillance.  *Third*, the Order analyzes the sufficiency of probable cause leading to the warrant to search Mr. Lucas's home.  *Finally*, the Order addresses Mr. Lucas's request for a *Franks* hearing and concludes with the court's overarching conclusions.

I.	Background

The court held an evidentiary hearing on the motion on October 31, 2023.  Unless otherwise noted, the court derives the following factual findings from evidence presented at that hearing.

### *Pole Camera Installation*

On May 11, 2022, the Kansas City, Kansas Police Department and the Bureau of Alcohol, Tobacco, and Firearms installed a pole camera on a utility pole outside defendant Ernest Lucas's property on Ruby Avenue, in Kansas City, Kansas.  Law enforcement agents didn't secure a search warrant authorizing the installation.  The agents initiated the installation as part of an ongoing investigation into one of Mr. Lucas's co-defendants, Chaz Hicks.  Doc. 105 at 2.  During that Hicks investigation, agents secured a search warrant for Mr. Hicks's phone and began receiving pings from it on April 16, 2022.  *Id.* at 2–3.  These pings pinpointed Mr. Hicks's location via GPS.  *Id.* at 3.  Based on these location pings, agents decided to place a pole camera outside Mr. Lucas's Ruby Avenue home.

### *Ruby Avenue Property Surveillance*

The pole camera surveillance in front of Mr. Lucas's home captured footage of the street, part of his driveway, his front yard, and the bottom corner of his residence.  The agents installed the camera by accessing a utility pole from public property.  Law enforcement officers could manipulate the camera remotely—zooming in or out and panning right or left—by clicking a link on a cell phone or computer.  Mr. Lucas's Ruby Avenue home sits on a dead-end street, with barriers at the street's end preventing vehicles from proceeding further.  The property is located

in a wooded area within the city of Kansas City, Kansas.  Mr. Lucas's property contains two homes.  Other than those two structures, no neighboring homes sit in close proximity.  *Id.* at 6.

The pole camera surveillance continued for 57 days.  *Id.* at 9.  During that time, Mr. Lucas was on house arrest based on a bond condition in a pending Johnson County, Kansas case.  *Id.* at 3.  Investigating agents made a list of the license plates and vehicles that the pole camera captured arriving and departing from the Ruby Avenue home.  Law enforcement officials used this information to identify multiple co-defendants.

### *The Search Warrant for the Ruby Avenue Home*

The pole camera surveillance footage also played a role in the Ruby Avenue home search.  Detective Jakob Blackman, one of the law enforcement agents involved in the relevant investigations, repeatedly referenced the pole camera footage in his supporting affidavit to secure a search warrant for the Ruby Avenue home.  *Id.* at 11.  Law enforcement officials executed the search warrant on July 6, 2022.  *Id.*  During this execution, law enforcement recovered a cell phone, multiple firearms, ammunition, narcotics, and drug-related paraphernalia.  *Id.*

Mr. Lucas challenges the pole camera surveillance's constitutionality and, as a result, the home search's supporting affidavit.  The court addresses the pole camera surveillance first, below.

## II.     Pole Camera Surveillance

Mr. Lucas argues that the court should suppress all evidence from the pole camera's warrantless use because it constituted a search in violation of his Fourth Amendment rights.  *Id.* at 14.  The Fourth Amendment protects the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"  U.S. Const. amend. IV.  A party can establish that a search violates this Fourth Amendment protection when the search either "infringes on a reasonable expectation of privacy *or* when it involves a physical intrusion

(a trespass) on a constitutionally protected space[.]" *United States v. Ackerman*, 831 F.3d 1292, 1307 (10th Cir. 2016) (emphasis in original).  To demonstrate a reasonable expectation of privacy, a party "'must show that he had a subjective expectation of privacy . . . and that society is prepared to recognize that expectation as reasonable.'" *United States v. Wells*, 739 F.3d 511, 522 (10th Cir. 2014) (quoting *United States v. Rhiger*, 315 F.3d 1283, 1285 (10th Cir.2003)).

Here, Mr. Lucas advances three arguments to demonstrate that he possessed a reasonable expectation of privacy in the area surveilled by the pole camera.  *First*, Mr. Lucas contends that he had an "especially strong" expectation of privacy in the area surveilled "because his home is located in an isolated part of Kansas City," on a dead-end street without neighbors.  Doc. 105 at 14.  *Second*, he argues that, due to his house arrest, the pole camera footage captured all his associations during the 57-day timeframe.  *Id.* at 16.  This compendium of his associations opened "an intimate window" into his life that violated his expectation of privacy in a manner similar to the long-term tracking of cell phone location data in *United States v. Carpenter*, 138 S. Ct. 2206 (2018).  *Id.*  *Third*, Mr. Lucas's reply asserts that he possessed a reasonable expectation of privacy in the area captured by the pole camera surveillance because that area is curtilage.  Doc. 112 at 5.  The court addresses each of these expectation of privacy arguments in turn.

### A.   Mr. Lucas's Expectation of Privacy and His Home's Isolation

Mr. Lucas asserts agents invaded his reasonable expectation of privacy when they "conducted nearly 57 days of [continuous] home surveillance[.]"  Doc. 105 at 14.  He further contends that his home's location in an isolated part of Kansas City heightens that expectation because "investigating agents admit that it would be impossible to surveil Mr. Lucas'[s] home in a traditional stake-out manner."  *Id.*  The government responds that Mr. Lucas hasn't supported sufficiently an expectation of privacy:  he hasn't proven "that the street outside of his house would be free from observation by others" and "everything he argues about having been

surveilled in violation of the Fourth Amendment occurred in the middle of the street on public property." Doc. 111 at 9–10.  Also, the government cites Tenth Circuit precedent which holds that a defendant similarly moving for suppression of warrantless pole camera footage "'had no reasonable expectation of privacy that was intruded upon by the video cameras.'" *Id.* at 12 (quoting *United States v. Jackson*, 213 F.3d 1269, 1281 (10th Cir.), *vacated on other grounds*, 531 U.S. 1033 (2000)).

In *United States v. Jackson*, our Circuit held that warrantless pole cameras—recording outside, but not inside, a residence—didn't implicate a homeowner's Fourth Amendment rights. 213 F.3d at 1281.  "The use of video equipment and cameras to record activity visible to the naked eye does not ordinarily violate the Fourth Amendment." *Id.* at 1280.  This surveillance doesn't violate the Fourth Amendment when a camera is "capable of observing only what any passerby would easily have been able to observe," because "activity a person knowingly exposes to the public is not a subject of Fourth Amendment protection, and thus, is not constitutionally protected from observation." *Id.* at 1281 (citing *United States v. Katz*, 389 U.S. 347, 351 (1967)).  Because the pole cameras in *Jackson* captured "only what any passerby would easily have been able to observe," the defendant homeowner had no reasonable expectation of privacy, and police didn't need to secure a warrant before installing the camera. *Id.*

More recently, in *United States v. Cantu*, the Circuit endorsed anew *Jackson*'s pole camera holding, deciding on "quite similar" facts that the "analysis could begin and end with *United States v. Jackson*[.]" 684 F. App'x 703, 704 (10th Cir. 2017).  Neither *Jackson* nor *Cantu* premised their holdings on the residence's relative isolation.[1]

---

[1] To be sure, *Cantu* referenced commercial buildings and a parking lot near the targeted residences in recounting the facts.  684 F. App'x at 704.  While this reference demonstrates that the residences at issue weren't in an isolated location, nothing in the opinion suggests the Circuit considered the

Here, under *Jackson*, Mr. Lucas lacked a reasonable expectation of privacy in the area captured by the pole cam. As in *Jackson*, the pole camera here recorded outside—but not inside—Mr. Lucas's residence, capturing only the street, part of his driveway, his front yard, and the bottom corner of his residence. 213 F.3d at 1281. And the pole camera, as in *Jackson*, captured "only what any passerby would easily have been able to observe." *Id.* So, under *Jackson*, Mr. Lucas hasn't established a reasonable expectation of privacy in the area captured by the pole cam, and the surveillance thus doesn't qualify as a search capable of triggering the Fourth Amendment's protections.

As a final consideration, the court isn't persuaded that an expectation of privacy analysis should consider the property's relative isolation. Mr. Lucas has cited no case law to support his position that the court should evaluate the relative isolation of a residence when performing an expectation of privacy analysis. And the court hasn't located any such authority either. The home's isolation thus is irrelevant.

**B.     Mr. Lucas's Expectation of Privacy and His Associations**

Mr. Lucas acknowledges that the Tenth Circuit, in *Jackson* and *Cantu*, has "rejected the argument that individuals have a reasonable expectation of privacy on their own property over time as recorded by pole cameras[.]" Doc. 105 at 17. But, Mr. Lucas asserts, the Supreme Court's more recent decision in *United States v. Carpenter* upends and supersedes these Tenth Circuit decisions. *Id.* at 17–18 (citing 138 S. Ct. 2220, 2223 (2018)). Mr. Lucas argues that, because he was on house arrest, the pole camera footage captured the whole of his associations during those 57 days—that is, it "recorded the arrival and departure of every person that Mr. Lucas interacted with at that property for nearly two months." *Id.* at 3. Law enforcement agents

---

residences' surroundings in its expectation of privacy analysis. To the contrary, the Circuit's analysis focused heavily on the residence itself.

7

"collecting this intimate information at their leisure at a private residence," Mr. Lucas contends, touches on the same "chronicle of the person's physical movements over time" that *Carpenter* held was a search. *Id.* at 16–17. To evaluate Mr. Lucas's *Carpenter* argument fully, the court reviews the *Carpenter* decision and how other courts have applied that decision in contexts like this one.

In *Carpenter*, the Supreme Court held that comprehensive cell-site location information (CSLI) acquired by the government constituted a search within the meaning of the Fourth Amendment. 138 S. Ct. at 2223. The Court justified its holding by noting the "deeply revealing nature of CSLI, its depth, breadth, and comprehensive reach, and the inescapable and automatic nature of its collection[.]" *Id.* But, the Court explicitly described *Carpenter*'s holding as "a narrow one." *Id.* at 2220. And, the Court clarified that it didn't "call into question conventional surveillance techniques and tools, such as security cameras." *Id.*

Other Circuits have considered the effect, if any, of the *Carpenter* decision on pole camera footage. The Seventh Circuit held that *Carpenter* didn't alter its pole camera precedent in a post-*Carpenter* case, *United States v. Tuggle*, 4 F.4th 505 (7th Cir. 2021). In *Tuggle*, the Seventh Circuit considered the government's surveillance of a suspected drug trafficker's home using three pole cameras over an 18-month period. 4 F.4th at 510. The Seventh Circuit held that the pole camera surveillance didn't constitute a search—*Carpenter* notwithstanding. *Id.* at 511, 523–25. The Circuit explained that "the government's use of a technology in public use, while occupying a place it was lawfully entitled to be, to observe plainly visible happenings, did not run afoul of the Fourth Amendment." *Id.* at 511; *see also United States v. May-Shaw*, 955 F.3d 563 (6th Cir. 2020) (holding that pole camera surveillance of an apartment parking lot over 23 days wasn't a search, post-*Carpenter*, though the Sixth Circuit didn't explicitly engage in an

8

analysis of—or even mention—*Carpenter* in its opinion); *but see United States v. Moore-Bush*, 36 F.4th 320, 321, 345–47 (1st Cir. 2022) (en banc) (Barron, C.J., concurring) (holding that pole camera footage of a private residence's curtilage over an eight-month period was a search because of its similarities to the search in *Carpenter*: both were comprehensive, both were easy, cheap, and efficient, and both were infeasible to evade).

Our court held, last year, that *Carpenter* didn't alter pole camera precedent in the Tenth Circuit. In *United States v. Hay*, Senior District Judge Julie A. Robinson addressed a motion to suppress premised on similar pole camera facts and an almost identical post-*Carpenter* argument. 601 F. Supp. 3d 943 (D. Kan. 2022). There, federal agents suspected defendant Hay of falsifying a physical disability to receive disability payments. So, agents installed a warrantless pole camera across the street from Hay's residence, using the camera to record 10 weeks of footage. *Id.* at 945. "The camera faced the front of Hay's residence, including his porch, front yard, and driveway." *Id.* Hay—like Mr. Lucas here—contended that the court should have suppressed the pole camera footage because "*Carpenter* 'upended' *Jackson*'s reasoning." *Id.* at 947. But Judge Robinson disagreed, declining to "disregard *Jackson*'s no-search ruling in light of *Carpenter*. *Jackson* remains binding precedent in the Tenth Circuit, and it forecloses Hay's argument that the pole camera surveillance invaded a reasonable expectation of privacy." *Id.* at 947–48.

The court again reaches the same conclusion here: despite *Carpenter*, *Jackson* remains binding precedent. And it thus forecloses Mr. Lucas's argument that the pole camera surveillance invaded a reasonable expectation of privacy. The Supreme Court explicitly cabined its *Carpenter* holding as "narrow" and clarified that courts shouldn't use its holding to "call into question conventional surveillance techniques and tools, such as security cameras." 138 S. Ct. at

9

2220.  So, even if the pole camera installed near Mr. Lucas's home isn't a "security camera"—and that is a debatable proposition—it likely falls into the category of "conventional surveillance techniques."  *Id.*  A pole camera, as the Seventh Circuit noted, is "technology in public use."  *Tuggle*, 4 F.4th at 511.  And law enforcement officers here used that technology "while occupying a place [they were] lawfully entitled to be, to observe plainly visible happenings."  *Id.*  The court remains unconvinced that *Carpenter* upends *Jackson*.

Mr. Lucas's attempt to equate pole camera footage with CSLI also proves unpersuasive.  Unlike CSLI, pole camera footage doesn't have the "retrospective quality" the Court found problematic in *Carpenter*.  138 S. Ct. at 2218.  With CSLI, law enforcement "need not even know in advance whether they want to follow a particular individual, or when."  *Id.*  But here, law enforcement identified the Ruby Avenue home and Mr. Lucas as a particular individual before collecting the footage.  This court concludes the pole camera footage doesn't present the same set of concerns that the Court considered in *Carpenter*.

Nor does Mr. Lucas's house arrest change the court's analysis.  Because of the restrictions of house arrest, the pole camera here allegedly captured the whole of Mr. Lucas's associations.  Indeed, for a person under house arrest, the pole camera would chronicle "familial, political, professional, religious and sexual associations" far more comprehensively than it would for a defendant not under house arrest.  *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring).  And indeed, *Carpenter* expressed concern about such a compendium of associations.  But to allow house arrest to alter the expectation-of-privacy analysis would produce a strange result:  the Constitution would supply a person on house arrest with greater protections than a person not on house arrest.  More importantly, Mr. Lucas offers

no case authority suggesting that his house arrest should alter *Jackson* and *Cantu*'s no-search rulings.

        **C.**        **Curtilage**

In his final attempt to establish a reasonable expectation of privacy, Mr. Lucas contends that the pole camera surveillance captured the curtilage outside his home. Doc. 112 at 2. Given that curtilage is a constitutionally protected area, Mr. Lucas argues that he "held a subjective expectation of privacy in his isolated home, driveway, and front yard" that society is prepared to accept that as reasonable. *Id.* at 3, 5. Invasion of this curtilage area by pole camera surveillance, Mr. Lucas asserts, implicates his Fourth Amendment rights. *Id.* at 3.

Curtilage "enjoys protection as part of the home itself" for Fourth Amendment purposes. *Florida v. Jardines*, 569 U.S. 1, 6 (2013). Curtilage "harbors the intimate activity associated with the sanctity of a man's home and privacies of life." *United States v. Dunn*, 480 U.S. 294, 300 (1987) (citation and internal quotation marks omitted). But a curtilage invasion requires a "'physical intrusion of a constitutionally protected area.'" *Jardines*, 569 U.S. at 5 (quoting *United States v. Knotts*, 460 U.S. 276, 286 (1983) (Brennan, J., concurring in the judgment)). The Tenth Circuit addressed the confluence of curtilage protections and pole camera surveillance in *Cantu*. 684 F. App'x at 704.

There, a video camera installed on a utility pole overlooked two residences. *Id.* The pole camera captured footage of a man with a prior felony conviction carrying an assault rifle in the common area between the two residences. *Id.* The man argued that the common area qualified as "curtilage and thus [as] a protected area under the Fourth Amendment." *Id.* at 705. But our Circuit clarified that there are "two different tests articulated in Fourth Amendment jurisprudence: the reasonable-expectation-of-privacy test and the common-law trespassory test." *Id.* A pole camera installed on a utility pole doesn't constitute a physical intrusion. *See id.* So,

11

even if the area captured on video by the pole camera "was curtilage, the surveillance did not violate [the defendant's] constitutional rights." *Id.* And the Circuit emphasized: "'That an area is within the curtilage does not itself bar all police observation.'" *Id.* (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)).

In light of our Circuit's holding in *Cantu*, whether the area surveilled by the pole camera constituted Mr. Lucas's curtilage is irrelevant to the reasonable expectation of privacy analysis. Even if the front yard, part of the driveway, and the corner of the house structure qualify as curtilage—and that is doubtful—surveillance of those areas with a pole camera didn't invade Mr. Lucas's curtilage because no physical trespass ever occurred and, so, "the surveillance did not violate [Mr. Lucas's] constitutional rights." *Id.*

In sum, none of Mr. Lucas's three theories establish a reasonable expectation of privacy. Pole camera surveillance, under Tenth Circuit precedent in *Jackson* and *Cantu*, isn't a search. Nor is the Circuit's no-search precedent upended by *Carpenter*—*Carpenter*'s holding is narrow and distinguishable. And the court concludes a reasonable expectation of privacy analysis doesn't change based on a defendant's house arrest. Finally, Mr. Lucas's argument about curtilage fails absent a physical trespass. The court thus holds that Mr. Lucas didn't experience a search via pole camera surveillance that violated the Fourth Amendment. And so, the court denies his motion to suppress the pole camera footage.

Next, the court considers the other prong of Mr. Lucas's motion to suppress—suppression of the evidence secured from the Ruby Avenue home's warranted search.

### III.     Evidence from Search of Mr. Lucas's Home

Mr. Lucas argues that the court should suppress all evidence from his home's warranted search. He contends the "search warrant affidavit in this case overwhelmingly relied on the pole

camera." Doc. 105 at 20.  If the court excises the pole camera footage from the affidavit, Mr. Lucas asserts, what remains fails to establish probable cause to issue a warrant.

"Probable cause refers to a probability or substantial chance of criminal activity based on the commonsense and practical considerations of everyday life."  *United States v. Pulliam*, 748 F.3d 967, 971 (10th Cir. 2014) (internal citations, quotation marks, and brackets omitted).  When a court reviews a warrant for probable cause, it must decide whether the issuing judge, based on the supporting affidavit submitted to the issuing judge, rightly deciphered "a fair probability that contraband or evidence of a crime will be found in a particular place."  *United States v. Cotto*, 995 F.3d 786, 796 (10th Cir. 2021) (citation and internal quotation marks omitted).

Here, the purported insufficiency of the affidavit's probable cause hinges on the court's excising the pole camera information as "obtained through a prior, unlawful search."  Doc. 105 at 20 (quoting *United States v. Mora*, 989 F.3d 794, 799 (10th Cir. 2021)).  But there's no reason to excise the pole camera information.  As discussed above, Tenth Circuit precedent requires the court to hold that the pole camera surveillance didn't amount to a search.  And Mr. Lucas makes no argument that the affidavit as a whole—as submitted to the issuing judge in its unexcised form—lacked probable cause.  So, the court denies this prong of Mr. Lucas's motion to suppress as well.

The court concludes with Mr. Lucas's final request—his request for a *Franks* hearing, below.

## IV. *Franks* Hearing

Finally, Mr. Lucas asserts that the affidavit, in its excised form, contains false statements or omissions and they justify a *Franks* hearing.  *Id.* at 22.  Mr. Lucas argues that, once the court excises the pole camera footage, what remains in the affidavit isn't sufficient to connect Mr. Lucas to Brandon Webb and Chaz Hicks.  *Id*. at 23–25.  For example, Mr. Lucas argues that

information Detective Blackman omitted from the affidavit would have attenuated Mr. Lucas's connection to Mr. Hicks and Mr. Lucas's purported role as Mr. Hicks's methamphetamine supplier. *Id.* at 26–27. Had the affidavit included the omitted information, Mr. Lucas asserts, it would have attenuated Mr. Lucas's connection to Mr. Hicks, and that attenuation would have altered the magistrate judge's probable cause determination. The government responds that the affidavit, when unexcised, provided sufficient information to support the Lucas-Hicks connection. *See* Doc. 111 at 26. So, even Mr. Blackman had included the omitted information, it wouldn't attenuate the connection between Mr. Lucas and Mr. Hicks in light of the whole affidavit. *See id.* Mr. Lucas never contests the government's response.

Under *Franks*, courts "'exclude evidence discovered pursuant to a search warrant when . . . a defendant proves by a preponderance of the evidence the affiant knowingly or recklessly included false statements in or omitted material information from an affidavit in support of a search warrant[.]'" *Smith*, 846 F. App'x at 648 (further citation and internal quotation marks omitted) (quoting *Campbell*, 603 F.3d at 1228). If the defendant makes this showing, courts ask whether "'after excising such false statements and considering such material omissions the correct affidavit does not support a finding of probable cause.'" *Id.* (ellipsis omitted) (quoting *Campbell*, 603 F.3d at 1229). A defendant must make a "'substantial preliminary showing'" of both recklessness and materiality before the court grants "an evidentiary hearing to prove a *Franks* violation." *United States v. Moses*, 965 F.3d 1106, 1110 (10th Cir. 2020) (quoting *Franks v. Delaware*, 438 U.S. 154, 155 (1978)). "The [*Franks*] Court emphasized that a defendant must make 'allegations of deliberate falsehood or of reckless disregard for the truth . . . [a]llegations of negligence or innocent mistake are insufficient.'" *Stewart v. Donges*, 915 F.2d 572, 582 (10th Cir. 1990) (quoting *Franks*, 438 U.S. at 171).

14

Finally, "the failure to show either materiality or recklessness is fatal to a defendant's entitlement to a *Franks* hearing." *Moses*, 965 F.3d at 1111.

Here, Mr. Lucas's argument suffers from the same fatal flaw as the motion to suppress the evidence acquired during the home search: Mr. Lucas premises the *Franks* hearing motion on the excised affidavit, not the affidavit in its totality. But, as discussed comprehensively above, the court has no basis to excise the affidavit. And even if the court excised the affidavit, the *Franks* hearing motion fails for another reason, *i.e.*, defendant hasn't established the requisite recklessness.

Mr. Lucas hasn't met his burden to show that Detective Blackman included a "deliberate falsehood" in the affidavit or demonstrated a "reckless disregard for the truth." *Stewart*, 915 F.2d at 582. The pole camera footage provided substantial evidence connecting Mr. Lucas to his co-conspirators. *See* Doc. 111 at 26 (explaining that the pole camera footage showed Mr. Hicks at the Ruby Avenue residence almost daily over a month period). When Detective Blackman composed the affidavit, he referenced that pole camera footage. *Id.* Given the clarity of the Lucas-Hicks connection established by Hicks's regular visits on the footage, Detective Blackman may have deemed any omitted information of little consequence in attenuating that connection. So, any such omissions wouldn't amount to a "deliberate falsehood" or a "reckless disregard for the truth." *Stewart*, 915 F.2d at 582. This analysis demonstrates why the court cannot evaluate Detective Blackman's decision to omit information on the grounds of an excised affidavit. The court could determine Detective Blackman's alleged recklessness only on the affidavit's entirety, where the court could evaluate omissions or falsehoods in the context of all the information Detective Blackman included. And Mr. Lucas never argues that, on the affidavit's entirety, such recklessness exists. Given that failure, the court denies the motion for a *Franks* hearing, as well.

**V.     Conclusion**

The court denies Mr. Lucas's Motion for *Franks* Hearing and to Suppress Evidence (Doc. 105). Applying binding Tenth Circuit precedent, the court holds that pole camera surveillance capturing events outside of a residence doesn't qualify as a search under the Fourth Amendment. So, the court finds no basis to suppress the pole camera footage at issue here. Without any pole camera footage suppressed, there's no reason to excise any material from the probable cause affidavit. And so, the rest of Mr. Lucas's motion collapses. Both the motion to suppress's second prong—the suppression of evidence secured in the search of Mr. Lucas's home—and the motion for a *Franks* hearing assume an excised affidavit, not an intact affidavit. But the affidavit here remains intact. And Mr. Lucas hasn't proffered any arguments for suppressing evidence acquired from the home's search or a *Franks* hearing based on an intact affidavit. So, the court denies Mr. Lucas's motion in its entirety.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for *Franks* Hearing and to Suppress Evidence (Doc. 105) is denied.

**IT IS SO ORDERED.**

**Dated this 29th day of November, 2023, at Kansas City, Kansas.**

                                               **s/ Daniel D. Crabtree**
                                               **Daniel D. Crabtree**
                                             **United States District Judge**