| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | DISTRICT OF KANSAS |
| 2 | |

```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF KANSAS
 2


 3
      UNITED STATES OF AMERICA,
 4                                     Case No. 22-20032
         Plaintiff,
 5
         v.                            Kansas City, Kansas
 6                                     Date:  10/31/2023
      ERNEST LUCAS (01),
 7
         Defendant.
 8    ..................................

 9

10                   TRANSCRIPT OF MOTION HEARING

11         BEFORE THE HONORABLE DANIEL D. CRABTREE
                 UNITED STATES DISTRICT COURT JUDGE
12

13

14    APPEARANCES:

15
      For the Plaintiff:     Michelle McFarlane
16                           United States Attorney's Office
                             500 State Avenue
17                           Suite 360
                             Kansas City, KS 66101
18

19    For the Defendant:     David M. Magariel
                             Office of Federal Public Defender
20                           500 State Avenue
                             Suite 201
21                           Kansas City, KS 66101

22

23

24
      _____
25      Proceedings recorded by machine shorthand, transcript
          produced by computer-aided transcription.
```

I N D E X

Plaintiff's Witnesses:                                        Page

JAKOB BLACKMAN
   Direct Examination By Ms. McFarlane                         8
   Cross-Examination By Mr. Magariel                          37

Rulings by the Court:

 Motion to Dismiss                                            89

E X H I B I T S

| Plaintiff's Exhibits | Offered | Received |
|---|---|---|
| 1 | 25 | 26 |
| 2 | 25 | 26 |
| 3 | 25 | 26 |
| 4 | 25 | 26 |
| 5 | 25 | 26 |
| 6 | 25 | 26 |
| 7 | 25 | 26 |
| 8 | 25 | 26 |
| 9 | 25 | 26 |
| 10 | 25 | 26 |
| 11 | 25 | 26 |
| 12 | 25 | 26 |
| 13 | 25 | 26 |
| 14 | 25 | 26 |

| Defendant's Exhibits | Offered | Received |
|---|---|---|
| 1 | 54 | 54 |
| 2 | 57 | 57 |
| 3 | 57 | 57 |
| 4 | 57 | 57 |
| 5 | 76 | 76 |
| 6 | 49 | 49 |
| 7 | 49 | 49 |
| 8 | 49 | 49 |
| 9 | 57 | 57 |
| 10 | 57 | 57 |

```
 1        (Court called to order.)

 2        THE COURT:  This is No. 22-20032, and specifically

 3   involving Defendant No. 1 in the case.  It's the *United States

 4   of America against Ernest Lucas*.  Let me begin by hearing your

 5   appearances starting with counsel for the United States.

 6        MS. MCFARLANE:  May it please the court, Michelle

 7   McFarlane appearing on behalf of the United States.

 8        THE COURT:  Ms. McFarlane, good morning.

 9        And for Mr. Lucas.

10        MR. MAGARIEL:  May it please the court, Mr. Lucas

11   appears in person, also with his attorney David Magariel.

12        THE COURT:  Gentlemen, good morning.

13        This is noticed on the docket as a motion hearing in

14   -- on -- in the case.  And, Mr. Magariel, I think both of the

15   motions -- now I have to correct myself.  I know there's a

16   motion for a *Franks* hearing, Document 105.  And as I have my

17   materials organized, there is an associated motion to suppress.

18   I don't recall from my notes whether that is a separate motion

19   or not, but in any event, tell me -- obviously if it were a

20   straightforward motion to suppress I'd look to your table first

21   to begin with evidence.  Tell me how you envision going forward

22   today, Mr. Magariel.

23        MR. MAGARIEL:  Judge, I think we're mostly taking up

24   that document.  I think there's multiple legal issues there.

25   We are requesting a *Franks* hearing.  We also have a motion to
```

1    suppress pole camera footage.  And then as a result, we have a

2    motion to suppress search warrant and other fruits related to

3    the pole camera.

4          I do have some exhibits.  I don't know if the

5    government has a position on this.  I anticipated that the

6    government would call Detective Blackman.  I could make some

7    proffers first, but I'll probably end up using those exhibits

8    with him anyway, and so may be -- it might be more efficient to

9    see if the government plans on calling Detective Blackman and

10   proceeding that way.

11         THE COURT:  So as -- I will hear from them in just a

12   moment.  As I thought about the issues and the way they kind of

13   linked to one another, the question whether the *Franks* hearing

14   should lead to some relief for you depends upon the reasonable

15   -- the reasonableness of the search you contend the government

16   conducted by the pole cameras.  Am I thinking about the issues

17   in the right way by your judgment?

18         When you look off to the side, it makes me think no.

19         MR. MAGARIEL:  I look off to the side when I'm

20   thinking, judge.

21         THE COURT:  I do the same.

22         MR. MAGARIEL:  I believe that that is correct.  I

23   think we have to win the pole camera stuff to get to the *Franks*

24   issues, because what's left in the warrant after the pole

25   camera is quite limited.  And I believe it would be material,

```
 1   some of the omissions that we've pointed out, if it wasn't for

 2   the pole camera information.  I think that's right, judge.

 3            THE COURT:  So, Ms. McFarlane, you want to join this

 4   fray?  Sort of -- as I think about the issues, it's sort of we

 5   have to start with figuring out whether something has to be

 6   subtracted from the affidavit that your agent -- your case

 7   agent submitted to secure the warrant.  Does it make sense for

 8   you to start over with the evidence on the reasonableness of

 9   the -- I know you don't think it's a search, but to the

10   reasonableness of the activity captured by the pole camera?

11            MS. MCFARLANE:  Your Honor, I think that that makes

12   sense.  Would it -- in that event, would the government present

13   evidence just on the suppression issue and then we would take

14   up the *Franks* issue after if -- if the court got to that point?

15            THE COURT:  I think so.

16            Mr. Magariel, do you want to weigh in on that

17   question?

18            MR. MAGARIEL:  Judge, I understand that we have a

19   certain burden to even get to a *Franks* hearing.  I don't think

20   what I would do as it relates to the *Franks* hearing would be

21   particularly extensive.  And while we have a witness up, it

22   might be efficient to take both issues up.  And then the court

23   could potentially say I heard certain evidence but I'm denying

24   your right to a *Franks* hearing, or the court could say I've

25   heard sufficient evidence.  But if the court wants me to hold
```

1   off on that, I obviously will do that.

2        THE COURT:  Yeah, I mean, I -- the -- trying to --

3   trying to characterize and capture what -- the burden that's

4   imposed on the defendant to get a *Franks* hearing is a bit of an

5   endeavor in itself.  I think it makes sense to look to the

6   government to at least capture the evidentiary setting of the

7   pole camera:  what it captured, what it didn't capture, how

8   long it ran, what the capacity of the camera.  I know there are

9   statements in the briefs about those, but I think it will give

10  me a richer ability to understand the context in which both

11  motions originate.

12       And so, Ms. McFarlane, I'm going to let you start with

13  the evidence that you would present on the suppression issue

14  and see how that informs the *Franks* hearing, and then maybe we

15  can collect as much of the evidentiary burden at this hearing

16  so that I could leave it prepared to write on both if I needed

17  to reach both.

18       MS. MCFARLANE:  Yes, Your Honor.  And I don't want to

19  complicate things even further, but the court -- is the court

20  intending to take up at today's hearing the motion to dismiss

21  filed by the defendant as well?

22       THE COURT:  I think so.

23       Mr. Magariel, my view of the motion to dismiss issue

24  is -- it's an interesting issue, but I think direct circuit

25  precedent precludes the dismissal.  And you may disagree with

1    that.  We can talk about the motion.  I ordinarily would -- I

2    would not view that motion as one requiring evidence.

3         MR. MAGARIEL:  I think that's right, judge.  When I

4    started writing it, I don't think circuit precedent precluded

5    everything.  And then about four days or five days before it

6    was due, a new circuit case came out that I think slowed me

7    down at the district court level.  So I'm hoping to raise that.

8         I think I would need either an *en banc* Tenth Circuit

9    case or something from the Supreme Court.  And so I think I

10   laid out in that motion where I think we are and what I think

11   the district court can do, but I am asking the court to rule on

12   that issue so that if Mr. Lucas needs to take an appeal in the

13   future --

14        THE COURT:  Sure.

15        MR. MAGARIEL:  -- that issue will be alive for him.

16        THE COURT:  Sure, makes perfect sense.  And I am

17   prepared to give you a ruling on that issue today.  It will

18   sound a lot like the circuit precedent that precludes the

19   defendant's argument.  And I will be a little bit more detailed

20   than that, but I think I can rule that without further argument

21   in light of the circuit's recent opinion.  Enough clarity for

22   you to begin?

23        MS. MCFARLANE:  Yes, Your Honor.  Thank you.

24        THE COURT:  Please do.

25        MS. MCFARLANE:  Your Honor, I would call Task Force

```
 1    Officer Jake Blackman.
 2          THE COURT:  Mr. Blackman, if you'll come to the front
 3    of the courtroom and stop to accept the oath from the deputy
 4    clerk.
 5                        JAKOB BLACKMAN,
 6    called as a witness on behalf of the Plaintiff, having first
 7    been duly sworn, testified as follows:
 8          THE COURT:  Please be seated.  You know how to move
 9    things around, sir.
10                      DIRECT EXAMINATION
11    BY MS. MCFARLANE:
12    Q.   TFO Blackman, can you please introduce yourself for the
13    record.
14    A.   Sure.  My name is Jakob Blackman, J-a-k-o-b.  Blackman is
15    B-l-a-c-k-m-a-n.  I am a detective with the Kansas City, Kansas
16    Police Department currently assigned to the Bureau of Alcohol,
17    Tobacco and Firearms.
18    Q.   And how long have you been a detective with the Kansas
19    City, Kansas Police Department?
20    A.   2016.
21    Q.   And how long have you been with the Kansas City, Kansas
22    Police Department?
23    A.   2011.
24    Q.   Okay.  So you had been a law enforcement officer since
25    2011?
```

1    A.   That's correct, yeah.

2    Q.   And how long have you been a task force officer with ATF?

3    A.   It was the summer of 2018.

4    Q.   Okay.  At all times from that period from 2011 until today

5    have you been a certified law enforcement officer?

6    A.   I have.

7    Q.   What types of cases do you investigate as both your duties

8    as a KCKPD detective as well as TFO with ATF?

9    A.   Sure.  So I kind of have two different hats.  I'm assigned

10   to the Violent Crimes Task Force in KCKPD that deals with

11   violent crimes of all types, including firearms offenses that

12   are at the state level.  And then on the federal side I

13   predominantly deal with federal firearms cases as well as we --

14   obviously our wires will cross with narcotic cases, and I'll

15   assist in violent crimes such as homicides as well.

16   Q.   Okay.  And in order to be a task force officer with ATF, do

17   you have to have any specialized training?

18   A.   Yeah, there's some training.  It's a position you're chosen

19   for.  Usually after some time being a detective and then once

20   you get to that position, then there's training within ATF

21   that's constant.

22   Q.   Okay.  And since you became a task force officer with ATF,

23   do you have all the training and necessary requirement

24   fulfilled in order to be a federal law enforcement officer?

25   A.   I do.

1   Q.  As part of your duties with ATF, do you and other members

2   of ATF investigate violent crime in the Kansas City area or is

3   it primarily, as you identified, firearms cases?

4   A.  Kind of both.  A lot of firearms offenses -- in recent

5   years ATF took a strong stance with violent crimes, crime scene

6   ballistic linking, things like that, so a little bit of both.

7   Q.  And do you have occasion with ATF or KCKPD to investigate

8   narcotics and Controlled Substance Act violations as well?

9   A.  Yes.

10  Q.  And can you kind of go through the intersection between

11  firearms cases, violent crime and drug cases.

12  A.  Yeah, so they're -- they're kind of synonymous.  I would

13  say, you know, narcotics -- if you investigate narcotic

14  offenses, usually you'll come across a firearm.  If you

15  investigate firearms cases, occasionally and even often you

16  come across narcotics.

17  Q.  Okay.  And can you give us an idea and inform the record

18  just of your training and experience with respect to

19  investigating specifically Controlled Substance Act violation

20  offenses?

21  A.  Since being released in law enforcement in 2011, I was

22  assigned predominantly to South Patrol.  Kind of presented in a

23  methamphetamine community early on.  Unfortunately, a lot of

24  narcotics, including meth, on the streets in Kansas City,

25  Kansas from the low levels small narcotics on people's persons

1    all the way up to larger levels.  It's all I've really done

2    since I've been a law enforcement officer.

3    Q.  So a lot of on-the-job training and experience with respect

4    to narcotics cases?

5    A.  Correct.  Yes.

6    Q.  And is it primarily methamphetamine in the Kansas City

7    area?

8    A.  You know, excluding marijuana, methamphetamine and -- and

9    the new addition of the fentanyl in the last couple years, I

10   would still say methamphetamine is still the number one drug

11   right now.

12   Q.  Okay.  And so you have experience in investigating drug

13   trafficking and specifically marijuana -- excuse me,

14   methamphetamine traffic in the Kansas City area?

15   A.  That's correct.

16   Q.  Okay.  I want to focus your attention on the investigation

17   that eventually ended up in the investigation of Mr. Lucas.

18   Can you give us an idea of how that specific investigation

19   began?

20   A.  Yeah.  So early on it was a -- an investigation focused on

21   the Southdale Blood Organization and some of their associates.

22   That was an early on case that we started in 2022.  As that

23   case proceeded down the road, we began focusing on an

24   individual by the name of Chaz Hicks.  During the investigation

25   into Mr. Hicks, we were presented with Mr. Lucas and his

1    address on 875 Ruby.

2    Q.  And before we get into Mr. Hicks, you mentioned the

3    Southdale Blood Organization.  Can you expand upon what that is

4    and what that means to you?

5    A.  Yeah, it's a criminal street gang in KCK loosely

6    associated, not very structured.  It's been around for a number

7    of years.  The case initially investigate -- was started

8    because some robbery detectives in Kansas City, Kansas had said

9    some of these individuals had committed some armed robberies.

10   Mr. Lucas was not included in those people.  And that's how it

11   started, just that group and some of their associates.

12   Q.  And was this investigation at least part of an initiative

13   that you and other members of ATF were engaged in in hopes of

14   reducing violent crime in the area?

15   A.  Yeah, I believe it was an attorney general's initiative

16   actually put down to us by our command staff at ATF.

17   Q.  Okay.  So you mentioned Chaz Hicks.  When you first became

18   aware of Mr. Hicks and his involvement in this group that

19   you're describing, what information did you have about what he

20   did and what type of criminal activity he was engaged in?

21   A.  Mr. Hicks was one of our primary targets in the beginning

22   of the investigation.  He was -- had allegedly had done some

23   armed robberies.  He was one of our -- our main targets.

24   During the course as the months continued, we learned from a

25   cooperating source that he was dealing larger amounts of

22-20032-01  USA v Ernest Lucas  10.31.23                    13

1  methamphetamine throughout Kansas City, Kansas, and we kind of

2  focused specifically on him.

3  Q.  And as part of that investigation, did you and other

4  members of ATF set up undercover purchases from Mr. Hicks on

5  April 21st, 2022; April 28th, 2022; May 10th, 2022; and

6  May 25th, 2022?

7  A.  That's correct.

8  Q.  Okay.  And did undercover purchases take place on those

9  days?

10  A.  They did.

11  Q.  At some point did you seek and obtain a warrant in order to

12  search his GPS location data?

13  A.  We did.

14  Q.  And was that about mid April of 2022?

15  A.  That's correct.

16  Q.  At that time were you also conducting physical surveillance

17  of Mr. Hicks?

18  A.  After the ping order came out, we had attempted to do

19  surveillance on him, and probably -- I can't remember specific

20  examples -- even prior to following him around was a difficult

21  task.

22  Q.  Okay.  How was Mr. Lucas and the home in which he lived,

23  how was that identified?

24  A.  So we first heard of 875 Ruby early on in 2022.  Special

25  Agent Granger and I actually spoke with the guy who provided

1    his address as somebody that was selling narcotics.  We weren't

2    very -- we weren't interested in it at first.  A lot of people

3    provide information on different addresses in a community that

4    are selling drugs.  We became more focused on 875 Ruby the

5    night of March 24th when we followed Brandon Webb in an arrest

6    operation where he, we believe, came from at least outside of

7    his house.

8         And Brandon Webb was an individual who we were focused on

9    in the overall operation or investigation into the Southdale

10   Organization specifically on a shooting that was charged back

11   in March that Special Agent Perez and I investigated.

12        And during the arrest operation, he had at least visited

13   the front of Mr. Lucas' house and left, and that began to kind

14   of perk our interest in maybe Lucas is somewhat linked to this

15   organization.

16   Q.  I want to ask some more details about Brandon Webb in just

17   a second.  You mentioned at the outset that there was an

18   individual who had provided information.  Was that, like, a

19   confidential source had provided information about 875 Ruby?

20   A.  It was an individual who we had contacted who had been

21   arrested and cooperated on providing information.  I never went

22   back, and he provided multiple different things that day.  And

23   that wasn't the only source of information that we had had.

24   KCK narcotics had been aware of the possibility of Mr. Lucas'

25   house as well.  And as the weeks went on, other law enforcement

 1    officers had reached out and said the same type of tips that

 2    they have had.  But that tip was never completely vetted out.

 3        I mean, when -- people say a lot of crazy things.  Mostly

 4    in that community people come up with a lot of scenarios.  So

 5    when someone says something about somebody's house, it's taken

 6    for what it is.  You have to definitely verify that kind of

 7    information.  That information, when Special Agent Granger and

 8    I -- was months or -- at least two or three months before we

 9    ever really became interested in Lucas.

10    Q.  And so you mentioned that there was other law enforcement

11    officers were in -- another law enforcement officer that had

12    observed some activity at that house; is that right?

13    A.  We got a tip from the DEA that there was a -- his house was

14    allegedly selling methamphetamine to somebody in Topeka.

15    Q.  Okay.  Did Officer Paulakovich with KCKPD also provide some

16    information?

17    A.  He did on May the 12th.

18    Q.  And what in general did he say about the house?

19    A.  I found out roughly -- I think it was May the 12th when I

20    found out that he had been sitting off that house trying to

21    stop cars out of that house -- in fact, stopping cars out of

22    that house.  I had contacted him, and he had said over the last

23    six to eight weeks he had observed a lot of vehicles coming and

24    going in the evening from that house.  He had five different

25    cars that he could give make and models that fled from him when

1    he tried to stop them, and he believed that Ernest Lucas was

2    selling meth from the residence.

3    Q.  And so you -- you also -- well, at some point did you link

4    875 Ruby to Ernest Lucas?

5    A.  Right.  It's a known address for his family for a long

6    time.  I actually think I found 873, which I think is the house

7    next door that I think is owned by the family.  There was some

8    confusion there for a while if that was even a house.  But,

9    yeah, that was a known address for him.

10   Q.  Before we talk more about Brandon Webb, can you kind of

11   describe the area in which 875 Ruby sits and what that general

12   area looks like?

13   A.  Right.  So Metropolitan Avenue in Argentine is a

14   thoroughfare.  Ruby Avenue sits to the south one block.

15   12th Street is kind of a thoroughfare north -- north-south that

16   takes you into Armourdale from Argentine.  Mr. Lucas lives at

17   the back of Ruby Avenue.  It would be all the way to the east

18   of Ruby Avenue on a dead end.  Yeah, I think it used to be a

19   street years ago but there's -- it's not a street that people

20   are allowed, to my knowledge, to drive through.

21   Q.  Okay.  And we're going to look at some photos in just a

22   second, but the -- is there a house -- are there houses to

23   either side of the house at 875 Ruby Avenue?

24   A.  So 875 faces to the north.  873 is to the east on the same

25   side of the road as 875.  Those are the only two houses back on

1   that side.  And as you proceed west, houses are on the north

2   side.  I don't think there's anything on the south side, at

3   least I don't think there is anything even standing anymore.

4   Q.  So you mentioned it's on a dead end street.  So by "dead

5   end street" are there, like, any houses on the dead end or is

6   it just a true dead end with nothing around it?

7   A.  It's a true dead end with nothing around it.  It's actually

8   wooded.

9   Q.  A wooded area?

10  A.  Correct.

11  Q.  Is there -- are there houses on the side across the street

12  from 875 Ruby?

13  A.  There is as you proceed to the west.

14  Q.  Okay.  And so would you describe this area as somewhat

15  remote?

16  A.  I would say it was remote, yes.

17  Q.  Okay.  And is that because of the lack of houses and

18  activity surrounding that area?

19  A.  Yeah.  And it's pretty quiet right through there.  I mean,

20  there's cars that we have seen drive and then they turn around

21  and they come back because they don't realize it's likely a

22  dead end.  So without -- with it being a dead end, there's not

23  a thoroughfare of traffic that's driving, you know, back and

24  forth all the time.

25  Q.  Okay.  So you mentioned that you were investigating Brandon

1   Webb as part of this overall investigation that you mentioned

2   that began in early 2022, and there was a specific date where

3   he -- where you were investigating him that he was at Lucas'

4   house?

5   A.   Correct.

6   Q.   And can you describe what -- what law enforcement was

7   doing, how you observed him at Lucas' house, and then what

8   happened throughout that day?

9   A.   So he was -- we had an active warrant for aggravated

10  battery, aggravated kidnapping for him.  It was an enforcement

11  evening with -- the U.S. Marshal Service was actually the

12  arrest operation -- was the arrest element of that operation.

13  We had observed Mr. Webb with two females leave another

14  residence that was somewhat close to Mr. Lucas' house.  The

15  marshals decided not to arrest him right then I think for some

16  tactical reasons.  It was their call.

17      The vehicle left.  We had surveillance -- a lot of

18  surveillance units that night followed Mr. Webb westbound on

19  Metropolitan, and surveillance units say he never made it out

20  to 12th Street.

21      I was one of the surveillance units that kind of came in a

22  little bit later, couple minutes after they were already

23  following them, and I knew that the only logical thing he would

24  have done is gone probably to Ruby Avenue.  I had no reason to

25  believe he was at Ernie Lucas'.  But I knew the address, so I

```
 1   said, "I'll just pop up to Ruby and see if he's down there."
 2        When I popped up to Ruby, I looked east and I saw
 3   headlights outside 875 Ruby.  I couldn't see what they were
 4   doing.  I couldn't see anybody coming in and out of the house.
 5   I was probably two or three city blocks west.
 6        After 10 minutes-15 minutes, that car proceeded back
 7   towards me west, turned back north.  I could tell it was a blue
 8   car.  Relayed the information to other surveillance units, and
 9   we followed that vehicle after identifying it was in fact
10   Brandon Webb's car.
11   Q.  Okay.  And so you were already -- what date was this?
12   A.  March 24th I think.
13   Q.  You were already aware -- you said that you were already
14   aware of 875 Ruby before that date?
15   A.  Correct.  Yeah, I mean, I was aware that Ernest Lucas lived
16   there.  I mean, there's not a lot back there.  There used to be
17   a trailer park back there.  So I thought, well, maybe he's at
18   the trailer park which I don't even think exists anymore.  Used
19   to be a trailer park that sat back there.  So just more of a
20   hunch maybe he's back there on Ruby at 875 Ruby, and the
21   vehicle was out front of his house.
22   Q.  What outside that whole situation with Brandon Webb and
23   everything that you've described so far caught -- about
24   875 Ruby caught your attention and led to you guys installing a
25   pole camera?
```

1   A.  That was basically it.  Brandon Webb was kind of how we

2   refocused back in March, and then the decision was made for the

3   camera up on Lucas' house.

4   Q.  Okay.  And what -- so at the point that you put the pole

5   camera up, what was your suspicion about what was going on at

6   875 Ruby?

7   A.  Narcotic related stuff, Webb being over there in March.  So

8   maybe some of the initial organization we investigated may have

9   been over there.

10  Q.  Okay.  When -- so did you and other members of ATF install

11  a pole camera outside of 875 Ruby?

12  A.  We did.

13  Q.  And I say pole camera.  Where was it installed and -- where

14  was it installed respect -- with respect to where 875 Ruby is?

15  A.  I'm guessing a hundred yards.  I haven't been out there and

16  looked.  I think it was about a hundred yards to the west of

17  the driveway of his residence.

18  Q.  And what date was that installed?

19  A.  May the 11th.

20  Q.  And when was it taken down?

21  A.  The day of the search warrant, which I believe -- July 7th

22  or 8th I believe was the warrants.

23  Q.  So it was taken down the same day as the search warrant was

24  executed?

25  A.  It was, yeah.

1  Q.  Okay.  So it was up from May 11th to on or about July 6th

2  of 2022?

3  A.  Right.

4  Q.  And so during that time frame was the camera recording

5  constantly?

6  A.  It was.

7  Q.  And the -- again, we're going to look at some photos, but

8  what -- the area that you -- where ATF installed the pole

9  camera, why was it installed on that specific pole I guess?

10 A.  We didn't want it obviously right in front of his house for

11 obvious reasons.  People can see something that's not normally

12 there.  We also focused it where we could just see the front of

13 the driveway portion of the residence.  We try to stay away

14 from anything that's going to look behind a house or over some

15 kind of privacy fence or anything like that.

16 Q.  And is that based upon your existing knowledge of the

17 legality of doing something like that?

18 A.  That's correct.

19 Q.  Okay.  And is that sort of in an effort to preserve that

20 evidence later down the road if, you know, an individual's

21 trying to suppress it?

22 A.  Yes.

23 Q.  Okay.  So the pole camera itself, can you describe how --

24 if it's able to be manipulated and how it's able to be

25 manipulated when it's recording, and then what you're able to

22-20032-01  USA v Ernest Lucas  10.31.23

1   do when you manipulate the camera?

2   A.   Yeah, so it's a -- it's a link that can go on a desktop or

3   on a phone.  Any person that has the link can manipulate the

4   camera.  There's a zoom capability where it can zoom in and

5   out.  You can pan left or right.  You can pan up and down.

6   It's not a 360.  It's -- I don't know the degrees, but it's --

7   it's -- it's somewhat in front of the -- where the camera's

8   facing.  It records 24/7.  And as you're doing that, it's

9   recording.  So, for example, if I'm recording something on the

10  ground underneath it, I can't go back later and review what was

11  up.  It's recording as it's being moved if that makes sense.

12  Q.   So, in other words, the angle -- so if you zoom in -- so if

13  you were watching it right now and you zoomed in the camera,

14  you can't later go back to this moment in time and zoom out the

15  camera and see what you couldn't see in that instance?

16  A.   Right.

17  Q.   So do you -- so you can -- you can live -- when you're

18  watching it live, it can be manipulated.  You can't manipulate

19  it after the fact?

20  A.   Correct.

21  Q.   Okay.  The recorded footage, is that footage kept and

22  maintained by ATF?

23  A.   It is.

24  Q.   And are you able to -- were you able to with this camera

25  zoom in enough to see and record and take down license plate

22-20032-01  USA v Ernest Lucas  10.31.23

 1    number -- license plate numbers of individuals who were

 2    visiting the area outside of 875 Ruby?

 3    A.   Yes.

 4    Q.   So are you able to hear sound and record sound on the

 5    camera?

 6    A.   I don't believe so, no.  I don't remember ever hearing

 7    sound on that camera.

 8    Q.   Have you -- have you and other members of ATF watched the

 9    footage in this case?

10    A.   A lot of it, yes.

11    Q.   Okay.  And when -- in your review of the footage, did you

12    review any recorded sound?

13    A.   No.

14    Q.   Okay.  So it's your understanding that the camera itself

15    doesn't have the ability to capture the sound?

16    A.   That's my understanding, yes.

17    Q.   Okay.  And so -- again, we're going to talk about the --

18    show some pictures in just a second.  But when you zoom in the

19    camera all the way, are you on -- in this specific instance

20    when you were doing that in the moment in live zooming in the

21    camera, were you able to see what -- like, read lips and what

22    people were talking about?

23    A.   I've never been able to read lips on that camera.  I --

24    definitely you can see facial features and identify people.  It

25    becomes harder at night just because of the ambient light.

1  Q.  Is there, like, night vision on it or are you just sort of

2  hoping that the streetlight and ambient light allows you to

3  see?

4  A.  Right, the streetlight makes a big difference.  You can

5  actually -- you can see more if there's somewhat of a light out

6  front the area you're trying to look at.

7  Q.  And out -- so outside of 875 Ruby was there a streetlight

8  that allowed you to see some things at night?

9  A.  I believe there was.

10  Q.  And was that a light that was just sort of maintained by

11  the city or was that something the ATF set up?

12  A.  We never set it up.  I -- I'm not even really --

13  specifically remember a light but -- I'm pretty sure there was

14  a streetlight on Ruby Avenue, but it wasn't anything we put up.

15  Q.  Okay.  And so other than -- but other than that, that

16  light, the -- the camera itself doesn't have the ability to

17  look -- like, capture night vision or anything like you'd see

18  on TV?

19  A.  No.

20  Q.  All right.  And with respect to the camera itself, when the

21  camera is all the way zoomed out, can you see the front of

22  875 Ruby?

23  A.  No.  You can barely see the front of 875 Ruby when it was

24  zoomed in because of the time of year it was and the position

25  of the camera.  But when it was zoomed out, you could see the

1   driveway, the mailbox.  If you could see the front of the

2   house, it would be the northeast corner, but I'd be surprised

3   if you can see it.

4   Q.  I'm going to show you a series of photos marked Government

5   Exhibit 1 through 14.  If you could take a look at those.

6            MS. MCFARLANE:  May I approach?

7            THE COURT:  You may.

8   BY MS. MCFARLANE:

9   Q.  And do you recognize Government Exhibit 1 through 14?

10  A.  I do.

11  Q.  And what do Government Exhibit 1 through 14 appear to be?

12  A.  They're a piece of paper with a still photo from a snip

13  from the pole cam.

14  Q.  And the same pole camera that was set up outside of

15  875 Ruby --

16  A.  Correct.

17  Q.  -- is that -- you had an opportunity to review parts of?

18  A.  Correct.

19  Q.  And are all these photos fair and accurate representations

20  of what the camera at 875 Ruby captured?

21  A.  Yes.

22            MS. MCFARLANE:  Your Honor, I'd move to admit

23  Government's Exhibit 1 through 14.

24            THE COURT:  Any objection to 1 through 14 of -- it

25  looks like the defendant's used number one too, so we'll call

1    these Government's 1 through 14.

2              MR. MAGARIEL:  No objection, judge.

3              THE COURT:  Government's Exhibits 1 through 14 are

4    received as part of the record in this evidentiary hearing.

5              MS. MCFARLANE:  And, Your Honor, I provided a copy for

6    the court.

7              THE COURT:  I have those --

8              MS. MCFARLANE:  Thank you.

9              THE COURT:  -- in front of me.  Thank you.

10   BY MS. MCFARLANE:

11   Q.   Can you describe what we're looking at in -- just in

12   general terms Exhibit 1?

13   A.   This is May the 25th.  This is a -- Chaz Hicks.  He had

14   exited his red Dodge Charger, was walking towards the front of

15   875 Ruby.

16   Q.   And so there is -- this is a screenshot of a pole camera

17   footage --

18   A.   Correct.

19   Q.   -- on May 25th, 2022?

20   A.   Correct.

21   Q.   And you can identify the person in that photo?

22   A.   Yes.

23   Q.   Can you tell us about how -- either how zoomed in or how

24   the camera was manipulated to capture this image?

25   A.   This was about the general angle that -- that it was

1  focused on most of the time.  This is about the right angle,

2  maybe a little bit further out in the street depending on what

3  was going on.  As far as zooming in, I can't say if that is

4  zoomed in all the way.  I don't remember.

5  Q.  Okay.  But you had the ability to manipulate the camera to

6  be able to capture this image?

7  A.  Correct.

8  Q.  And can you talk about what's in Government's Exhibit 2?

9  A.  This is about 8 minutes after that photo was taken, or that

10  snip of that video, of Mr. Hicks walking back out to his

11  vehicle.

12  Q.  And you're able to identify both Hicks and his vehicle

13  based upon that?

14  A.  Correct.

15  Q.  What's in Government's Exhibit 3?

16  A.  This is Mr. Hicks.  He retrieved a black and red bag out of

17  the back of his vehicle and was walking back toward the front

18  of 875 Ruby.

19  Q.  And Government's Exhibit 4?

20  A.  This is Mr. Hicks walking back to his red Charger and

21  enters it and will drive away westbound.

22  Q.  Okay.  And Government's Exhibit 5 is what?

23  A.  This was a different date.  If I recall, I think it's

24  June 22nd.  This is an image of Mr. Lucas, Chaz Hicks, and an

25  unknown male who was in that silver Impala or Malibu, whatever

1    that is.

2    Q.  And can you tell us about what you're able to see?  Like,

3    kind of describe what you're able to see in the photo apart

4    from the people in it, like, the area that's around it, what

5    you're able to see, if anything, of Mr. Lucas' house?

6    A.  You can barely see on the far right -- I'm not sure if

7    that's 875 or 873.  You can barely see some structure back

8    there.  All the way back you can see the barriers, the concrete

9    barriers that block Ruby Avenue, and then there's -- looks like

10   a silver Monte Carlo and maybe a Cadillac Escalade that's

11   parked along with that yellow car.  Camaro was Hicks' car at

12   the time when this was -- he was using that and occupying that

13   car at the time.

14   Q.  And what's in Government's Exhibit 6?

15   A.  This shows what it looked like all the way zoomed out.

16   Q.  And can you describe what you can see, if any, of

17   Mr. Lucas' house or yard or driveway?

18   A.  Can't see much.  You can see the front of his -- where his

19   driveway opens up.  You can see his mailbox.  I can't really

20   see a structure there.  I think this is Mr. Lucas actually

21   walking down Ruby Avenue that's -- if that is him kind of in

22   the middle towards the bottom of the photo.

23   Q.  And so that angle would be without any sort of manipulation

24   on the zoom feature --

25   A.  Right.

1   Q.  -- of the camera?

2   A.  That's correct.

3   Q.  Government's Exhibit 7?

4   A.  This is a photo of -- I don't recall the exact date on

5   this.  That's Abraham Gallegos.  That's his Ford truck and

6   that's Mr. Hicks' Camaro and that's Mr. Lucas handing him a

7   plastic sack.

8           THE COURT:  Can I just be clear which one in Exhibit 7

9   the witness means when he says "that is Abraham Gallegos"?

10          THE WITNESS:  Sir, it's the gentleman in the blue

11  t-shirt.

12          THE COURT:  Thank you.

13  BY MS. MCFARLANE:

14  Q.  And you mentioned a plastic sack.  Who -- who is handing

15  who a plastic sack?

16  A.  On this date I believe Lucas handed him that plastic sack.

17  Q.  Okay.  And Government's Exhibit 8?

18  A.  This is, again, the white Ford truck.  This is Mr. Lucas

19  exiting that truck with a black plastic or garbage sack.

20  Q.  And do you recall the approximate date on this one?

21  A.  I don't.

22  Q.  And Government's Exhibit 8?

23  A.  That was eight, ma'am.

24  Q.  Government's Exhibit 9?

25  A.  Again, I don't know the date on this one either.  That is

1   the Chevy Equinox that we had identified in the investigation.

2   That's Mr. Lucas standing outside of it, appears to have a

3   firearm, and that is a motorcycle in the front and some vehicle

4   I can see behind a Chevy Equinox that's kind of behind it,

5   backed in behind it.

6   Q.  So the pole camera is clear enough that you can see whether

7   or not an individual's carrying something like a firearm?

8   A.  Depending on the size of the firearm and how somebody's

9   carrying it, yeah, something like this you can see.

10  Q.  And during the middle of the day, as this exhibit clearly

11  is because it's light and you can see, you can see the -- with

12  enough specificity to be able to tell colors of items people

13  are carrying and colors of shirts people are wearing?

14  A.  Yes.

15  Q.  Okay.  And what is Government's Exhibit 10?

16  A.  This is I believe June the 6th, and this is another angle

17  kind of angled more towards the driveway and where the house

18  would be sitting a motorcycle at the end of the driveway, and

19  that's Mr. Lucas walking from the driveway.

20  Q.  Can you see the front of the house in this picture?

21  A.  I can see part of some structure.  Like, again, I think

22  that's -- I think that's 875 Ruby or it could be 873.  I can't

23  -- from that angle I don't know, but you can see a portion of

24  the house.

25  Q.  And you mentioned the time of year that this was, so May to

1   July.  And this was a wooded area; correct?

2   A.  Yeah, I mean, around the house -- I mean, you know, the

3   house is mowed down, but across the street's woods, woods

4   behind the house, woods at the dead end, and actually woods a

5   little to the west of the house as well.

6   Q.  And just kind of jumping back to Government's Exhibit 6

7   real quick, did -- in the all-the-way-zoomed-out-view of

8   Government's Exhibit 6, does that give an idea of what the area

9   -- what the area, that street looked like during that time

10  frame in 2022 --

11  A.  That's correct.

12  Q.  -- when the pole camera was up?

13  A.  Yes, ma'am.

14  Q.  Okay.  What's depicted in Government's Exhibit 11?

15  A.  That's, again, June the 6th.  That's, again, facing the

16  front or down Ruby.  That's Mr. Lucas walking west down Ruby

17  Avenue.

18  Q.  Okay.  And Government's Exhibit 12?

19  A.  This is a -- I believe that was a BMW that pulled up a

20  little bit further west and stops as Mr. Lucas approaches the

21  vehicle and contacts the driver at the window.

22  Q.  If there -- how far -- how far does 875 Ruby, the house,

23  sit from the street that we're looking at in all of these

24  photos if you -- if you know?

25  A.  Twenty yards, maybe 15 yards.

1   Q.  And so viewing the pole camera footage, if a person, or

2   like in this photo when Mr. Lucas walks back to the house, are

3   you able to see him walk back and enter his house?

4   A.  No, at no time could we actually see anybody open the door

5   to that house and go in.  The camera wouldn't allow us to see

6   that.

7   Q.  Okay.  If a person would have parked further up the

8   driveway, does the driveway go all the way up to the house?

9   A.  It does.  It actually I think runs, if I remember, on the

10  west side of the house.  It kind of comes up along the west

11  side of the house and it kind of -- there's also a little piece

12  that goes further west, like, a little parking stall area.

13  Q.  And you couldn't see any of that from the pole camera?

14  A.  No.

15  Q.  So if a person were to park in that area that you're

16  describing, they wouldn't be captured on the pole camera

17  actually parking their car?

18  A.  No.  If you don't park at the very end where you can see

19  that in Government's Exhibit 12 where that motorcycle's at, if

20  you're not in that -- that little area there, you can't see

21  where the vehicles are parking at.

22  Q.  Okay.  What is in Government's Exhibit 13?

23  A.  That's Mr. Lucas contacting the driver of that BMW on June

24  the 6th.

25  Q.  And then what is in Government's Exhibit 14?

1  A.  Mr. Lucas had handed him what looked like a square -- a

2  white square either -- possibly wrapped in a grocery sack.  I

3  couldn't tell from that specific shot there.  Handed that

4  object to the driver from the window.

5  Q.  So is this on the same day as Government's Exhibit 13?

6  A.  Right.  He just kind of went in the order of events as he

7  walked down the driveway west and then eventually handed him

8  this in 14.

9  Q.  Okay.  Was the pole camera at any point moved to capture a

10 different angle than what we see in Government's Exhibit 1

11 through 14?

12 A.  No.

13 Q.  And so the angle that we see in Government's Exhibit 1

14 through 14, that's the angle that you saw and that was captured

15 for the entire May to beginning of July time frame?

16 A.  Correct.

17 Q.  And so just sort of as an overview, these exhibits, these

18 screenshots of the pole camera, is that a representative sample

19 of the activity that was seen outside -- as part of the review

20 of the pole camera footage outside of 875 Ruby?

21 A.  Right, it is.

22 Q.  Okay.  Did you ever conduct -- did you or other members of

23 the law enforcement ever conduct physical surveillance at

24 875 Ruby?

25 A.  We did.  At one point we followed Abraham Gallegos out of

1    there.

2    Q.   Okay.  And you mentioned that Officer Paulakovich -- I

3    think you mentioned Officer Paulakovich conducted some physical

4    surveillance and made car stops?

5    A.   Right.  He would have for sure, yes.

6    Q.   And at any point -- at any point and in any way you

7    manipulated the camera, would you be able to see inside of

8    875 Ruby?

9    A.   No.

10   Q.   And you mentioned, like, a retainer -- a stone retainer

11   wall.  Were you able to see over that?

12   A.   Well, I think the retainer wall I'm talking about is the --

13   it blocks the end of Ruby Avenue.

14   Q.   Okay.

15   A.   They're, like, Jersey barriers.

16   Q.   Okay.

17   A.   You could see on the other side of the Jersey barrier, but

18   that was going to the dead end.

19   Q.   Okay.  Okay.  Could you see activity -- could you see

20   activity in that front yard area that you can see in some of

21   the photos or is -- well, can you see activity in that front

22   yard area in the photos?

23   A.   Yeah, I mean, just what you could see on the photos.  If

24   there was somebody in the front yard between what would be the

25   residence and the mailbox and further to the east, you would

22-20032-01   USA v Ernest Lucas   10.31.23

1    see people in the front yard --

2    Q.   Okay.

3    A.   -- if they were standing in the front yard or at the end of

4    the driveway.

5    Q.   Because the photos in Government's Exhibit 1 through 14 all

6    capture activity that's occurring in the street in front of

7    875 Ruby; correct?

8    A.   Right.   If there was any activity and there was people

9    walking occasionally in the front yard, you would see that as

10   well.

11   Q.   Do you recall the type of activity that's depicted in

12   Government's Exhibit 1 through 14, any type of meet-ups or

13   anything like that occurring in the front yard area?

14   A.   We would see the -- one of the co-defendants park his

15   vehicle and walk towards the front of the house through the

16   front yard --

17   Q.   Okay.

18   A.   -- presuming to bang on the door, make contact with

19   somebody, and then walk back.

20   Q.   Okay.

21   A.   I remember seeing people mow the front yard, but, I mean,

22   most of the activity we saw was out in the street or at the end

23   of the driveway.

24   Q.   Okay.   And that street, Ruby Avenue, that street is Ruby

25   Avenue; correct?

22-20032-01  USA v Ernest Lucas  10.31.23

36


```
1    A.   Correct.

2    Q.   And is that a public street --

3    A.   It is.

4    Q.   -- as far as you know?

5         It's not private property?

6    A.   No.

7              MS. MCFARLANE:  Your Honor, may I have just one

8    minute?

9              THE COURT:  You may.

10   BY MS. MCFARLANE:

11   Q.   What was the purpose -- what was the purpose of installing

12   the pole camera outside of Lucas' house?

13   A.   To capture any criminal activity that we could.  And, you

14   know, us sitting -- sitting on that street without the -- that

15   pole camera would have been -- would have been tough for us to

16   do.

17   Q.   And do you feel like, in your review of the pole camera

18   footage, that the pole camera captured criminal activity?

19   A.   For sure.

20   Q.   And did that criminal activity occur in the street outside

21   of 875 Ruby?

22   A.   Correct.

23             MS. MCFARLANE:  Your Honor, I don't have any other

24   questions at this time about the pole camera.

25             THE COURT:  All right.
```

U.S. District Court, 500 State Avenue, Kansas City, KS
(913) 735-2314

```
 1              Wish to cross-examine?
 2              MR. MAGARIEL:  Yes, judge.  Can I have just a moment?
 3              THE COURT:  You may.
 4                            CROSS-EXAMINATION
 5   BY MR. MAGARIEL:
 6   Q.   Good morning, sir.
 7   A.   Good morning.
 8   Q.   I want to start talking to you a little bit about the pole
 9   camera itself.  I know the government asked you some, but I
10   just -- I want to make sure I understand all the capabilities
11   of the camera.
12   A.   Sure.
13   Q.   Do you know who manufactured it?
14   A.   I have no idea.
15   Q.   You don't know about the company?
16   A.   No, there's a -- we have a technical shop at ATF that does
17   all that.  I don't have a clue.
18   Q.   Okay.  But it sounds like you know some of the capabilities
19   of the camera?
20   A.   As far as, like, a case agent on how to use it, that's what
21   I know how to do.
22   Q.   You're not the one who installed it?
23   A.   No.
24   Q.   Who did that?
25   A.   The technical officers or agents with ATF.  I believe -- I
```

1    don't want -- there's only two of them.  It was one of the two

2    that did it.

3    Q.  And technical officers, is this -- is this, like, the short

4    name for just the tech computer expert folks?

5    A.  Yeah, that's -- yeah, they -- they assist with tools used

6    by ATF agents to assist in investigations.  That's their whole

7    job, but they're -- they're agents.

8    Q.  Do you know exactly when they installed the camera?

9    A.  May the 11th.

10   Q.  Did they install it overnight?

11   A.  I -- I'm not sure when they installed it.  I -- I'd have to

12   look at when it started.

13   Q.  Okay.  Do you know what they used to install it?

14   A.  I don't.  I know there's a -- there's a truck that they

15   use, but I don't know besides that how it's done.

16   Q.  Okay.  Is it, like, a utility truck that you might see for

17   a utility company?

18   A.  Something similar.

19   Q.  So they had to get up high to install that camera?

20   A.  They do.

21   Q.  Do you know how high up that camera is exactly?

22   A.  I don't.  It's pretty high.

23   Q.  Do you have an estimate about how high it is?

24   A.  I would be -- I'd be -- I don't --

25   Q.  You're not sure?

1   A.  I'm six-four and I couldn't jump up and grab it.

2   Q.  Would you have been even close?

3   A.  Not even close.

4   Q.  I don't know what kind of jumper you are.

5   A.  Not that high.

6        THE COURT:  Do you want him to step down and

7   demonstrate?

8        MR. MAGARIEL:  I don't, judge.

9   BY MR. MAGARIEL:

10  Q.  But we're not talking it's 10 feet off the ground?

11  A.  No, it's not.  I mean, you can get a pretty good idea I

12  think from one of the government's exhibits when it's

13  completely panned back into the -- you can -- a pretty good

14  idea it's pretty high.

15  Q.  Like, whoever installed it didn't use a ladder?

16  A.  No.  No.

17  Q.  They would have had to use a truck probably with one of

18  those --

19  A.  Like a boom truck --

20  Q.  Yes.

21  A.  -- that's correct.

22  Q.  All right.  And you don't know if they installed it

23  overnight or not?

24  A.  I have no idea.

25  Q.  Do you know if they do any subterfuge when they install it?

22-20032-01  USA v Ernest Lucas  10.31.23                          40

1   Like, do they try to make themselves appear like they work for

2   a utility company?

3   A.   I'm sure they're not dressed in things that has "law

4   enforcement," you know, hanging off of them.  It's usually

5   jeans and a t-shirt.

6   Q.   Have you seen the truck?

7   A.   I have.

8   Q.   Does it say anything on the truck?

9   A.   I don't remember if it says anything on the truck or not.

10   I know -- I don't remember if there's, like, a schematics on

11   the side.  I don't remember seeing anything like that.

12   Q.   Obviously it doesn't say FBI?

13   A.   Doesn't say that.

14   Q.   Or ATF?

15   A.   Doesn't say that.  Well, no, I don't think it says that.

16   Q.   Okay.  All right.  And you said you don't know who

17   manufactures the camera but you know it can zoom?

18   A.   Correct.

19   Q.   Do you know how -- how close in it can zoom?

20   A.   I don't know exactly, you know, what magnification it would

21   be.  I don't know.  Yeah, I don't know.  I'm trying to answer

22   that the best way I can for you.

23   Q.   We'll have to use the photos to have an idea obviously?

24   A.   Right.

25   Q.   And it can pan to the left, pan to the right; is that

22-20032-01  USA v Ernest Lucas  10.31.23

1   correct?

2   A.   It can.

3   Q.   And it can pan up and pan down?

4   A.   Correct.

5   Q.   So do I understand that the camera then, if you're

6   controlling it to move, it physically moves to the right some

7   degrees, physically moves to the left some degrees; is that

8   right?

9   A.   That's correct.

10  Q.   But you don't know exactly what the degrees are?

11  A.   No, I don't, but I know it can't -- if you go too far then

12  you don't see anything because you're in the box.  If you go

13  too far left, then you're in the box, like, you're in where the

14  camera's at.  So it's not a 360-degree camera.  You can go

15  right, left, up and down in a certain window.

16  Q.   And I'm assuming that you said "because it's in the box"

17  because the camera's physically housed in something?

18  A.   Correct.

19  Q.   And then I heard you describe that anyone with the link,

20  which I assume means a link to not a public website but a

21  private website, can do the panning and zooming of that camera?

22  A.   Correct.

23  Q.   And so you could do that from your phone?

24  A.   I could.

25  Q.   Or you could do that from a computer?

1   A.  Laptop or phone, correct, or, like, a tablet too I'm sure.

2   Q.  And I assume you're the one who did that sometimes?

3   A.  I did myself and a few other agents that were assisting

4   with this case.  This was a group investigation.

5   Q.  And you've already described I think, but if you are

6   panning left or right or zooming, the camera is recording that

7   view?

8   A.  Right.

9   Q.  And it's not going to record the generic sort of set view

10  that you had otherwise?

11  A.  No, it -- yeah, if you -- if you manipulate the camera and

12  let's say you're trying to -- you're trying to focus down low

13  but you accidentally go high, let's say you hit the wrong

14  button, you're never going to see what was low unless that was

15  in the field of view.  It records as the camera moves.

16  Q.  I assume by you saying that you can access it by an app or

17  a desktop, that means that the camera is connected to a

18  wireless Internet network?

19  A.  I would say that's probably correct.  I'm not -- I don't

20  deal with any -- like I said, I don't know how all that works.

21  Someone at ATF does that.

22  Q.  Do you have to be close to the camera to be able to control

23  it?

24  A.  No.

25  Q.  You could do it from miles away?

 1   A.  That's correct.

 2   Q.  You could do it from anywhere?

 3   A.  Yes.

 4   Q.  I mean, you could be in Florida as long as you have the

 5   link?

 6   A.  Yes.

 7   Q.  Safe to assume that means it's on the Internet?

 8   A.  Obviously you're correct, yes.

 9   Q.  And so it presumably either uses cell phone data or some

10   sort of wireless network that your tech folks installed?

11   A.  Correct.

12   Q.  Do you know which one?

13   A.  I don't.

14   Q.  But, again, you can log into that from wherever you like.

15   So if you went on vacation and for some reason you decided you

16   wanted to go look at Mr. Lucas' house, you could do that?

17   A.  I could.

18   Q.  And then you've already said it records 24/7?

19   A.  Yes.

20   Q.  And how is it saved?  How is -- because you said you could

21   go back later and look at the camera, how is it saved?

22   A.  It comes in a -- we get it in a hard drive from the tech

23   guys and then it goes on some server somewhere with ATF.  And

24   I'm well out of my wheelhouse talking about that.  I don't know

25   how that works.  I know when we're done, we get it -- for

1  obvious reasons why we're here, discovery, things like that, I

2  get it on a hard drive that I provide for discovery and

3  ultimately you get.

4  Q.  Were you get -- okay.  Were you getting the hard drive as

5  it was recording or you got the hard drive later?

6  A.  At the end.

7  Q.  Then while the investigation is going, are you able to go

8  back and look at historic camera views?

9  A.  Right.  As long as it's up, we can go back from that link.

10  It opens up the camera.  We can review it as long as the camera

11  is up.  When the camera comes down, we have to have that

12  external hard drive provided to us.

13  Q.  Okay.  So let's clarify those two things, because I think

14  it is two different things.

15  A.  Correct.

16  Q.  While the camera is up you could go back and look at

17  historic camera views, again, while the camera is physically

18  up?

19  A.  Correct.

20  Q.  So safe to assume that that is stored somewhere in the

21  cloud?

22  A.  Safe to say.

23  Q.  Okay.  They didn't send you a hard drive?

24  A.  No.

25  Q.  You could go into that same link and then you could go

22-20032-01  USA v Ernest Lucas  10.31.23

1    rewind a week and look at a different camera angle --

2    A.  We could.

3    Q.  -- or different day?

4    A.  Different -- yeah, we could.

5    Q.  And then could you search when the camera was up by date

6    and time?

7    A.  Yes.

8    Q.  So you're speaking to a witness and they say I was at that

9    house on June 5th at three o'clock, you could go back and look

10   at June 5th and three o'clock to verify if that's true or not?

11   A.  Correct.

12   Q.  Assuming June 5th was a week ago, you're now talking to

13   that person June 12th?

14   A.  Yeah, I understand.

15   Q.  And you said that you don't believe it has sound?

16   A.  Yeah, I've never heard sound on that camera.

17   Q.  You didn't try to access it it sounds like?

18   A.  I didn't even -- I've never seen the option, so that's why

19   I don't believe there is.

20   Q.  Okay.  And then we talked a little bit about how it's

21   searchable by date and time.  Is there another way you can

22   search?

23   A.  When it comes up, it comes up as a calendar on the right

24   side of the screen, and the dates that it recorded are bolded.

25   And you just click on the dates, and you can search by the

1  time.

2  Q.  And so I think that is shown actually in a couple of the

3  government's exhibits.  Do you still have those in front of

4  you?

5  A.  I do.

6  Q.  On Government's Exhibit 10 --

7  A.  Right, that -- that represents that, sir, yeah.

8  Q.  And so, in fact, it says there archive date selection?

9  A.  Right.

10 Q.  And so that is a -- you can click left and right, go to

11 different days, and then you can search particularly by a

12 window of time?

13 A.  That's correct.

14 Q.  And it looks like it lets you get -- narrow all the way

15 down to the minute?

16 A.  It does, yes.

17 Q.  Okay.  And then we talked a little bit about what you could

18 do when the camera was posted.  After the camera was taken down

19 when you executed the search warrant, you were then sent a hard

20 drive or multiple hard drives with this information?

21 A.  I believe it was just one.  Sometimes hard drives will fill

22 up and they'll give you a separate hard drive to -- because it

23 fills up sometimes you'll get two, but I -- I don't remember on

24 this.  It was whenever May the 11th to the day of the search

25 warrant, whenever that was.

```
 1   Q.  Do you know how many terabytes that drive was?

 2   A.  I don't know.

 3   Q.  Fair to say it was terabytes?

 4   A.  Oh, yeah, it definitely is.  Yeah.

 5   Q.  And you said sometimes you get multiple drives.  The

 6   technology's getting better these days.  Even those smaller

 7   external hard drives can hold a lot of data; is that right?

 8   A.  It can.

 9   Q.  Okay.  But you don't know how many terabytes the data was

10   in this particular case?

11   A.  I have no idea.

12   Q.  And I think we've already said you can fast forward and

13   rewind through the video?

14   A.  You can.

15   Q.  And then I thought I understood you to say earlier that you

16   weren't able to read lips using anything from the video.  Are

17   you trained in lip reading?

18   A.  I am not.

19   Q.  Okay.  Government's 13 is in front of you I think.

20   A.  Yes.

21   Q.  That is obviously a fairly zoomed in version of the camera?

22   A.  It is.  That's -- that's the closest we've ever saw

23   Mr. Lucas in the investigation because he walked to the west of

24   that vehicle.  For some reason that vehicle didn't pull up to

25   the end of his driveway.  He actually physically walked and met
```

1   him.

2   Q.  Okay.  And you're telling me from this angle you don't

3   believe that lips could be read?

4   A.  I don't believe I could read his lips from here.

5   Q.  Okay.  But you don't have any training in lip reading?

6   A.  But I don't.

7   Q.  Did you ask someone to try to read lips in this case?

8   A.  I never asked anybody to try to read lips.

9   Q.  Is anybody in your office able to do that?

10  A.  Not that I know of, no.

11  Q.  I guess I'm confused by the comment that you don't think

12  it's close enough to read lips.  You don't know how to do that;

13  is that right?

14  A.  Right, I don't think -- I don't think I could read his lips

15  if he was talking in that -- in that video there.

16  Q.  Okay.  But you don't know how to read lips?

17  A.  But I don't know how to read lips.

18  Q.  Okay.  Do you remember testifying in front of I think two

19  different grand juries related to this case?

20  A.  I'm sure, yeah.

21  Q.  You've probably testified in front of a fair number of

22  grand juries?

23  A.  Yes, I have.

24  Q.  And then were you aware that a different agent, Agent

25  Belinda Perez, testified in front of grand juries in this case.

1  A.  I'm sure she did.  We were co-case agents on this case.

2  Q.  Okay.  That's how you would describe the roles of the two

3  of you --

4  A.  Yeah.

5  Q.  -- co-case agents?

6  A.  Yeah.

7        MR. MAGARIEL:  Judge, may I approach?

8        THE COURT:  You may.

9  BY MR. MAGARIEL:

10  Q.  I'm handing you a few exhibits here.  I'm handing you

11  what's been marked as Defendant's 6 through 8.  If you take a

12  moment to look at those please.

13        THE COURT:  This is 6, 7, 8?

14        MR. MAGARIEL:  Yes, judge.

15        THE COURT:  Thank you.

16  BY MR. MAGARIEL:

17  Q.  Did you get a chance to look at those?

18  A.  I did, sir, yeah.

19  Q.  Fair to say those are images from the pole camera that

20  we've been talking about this whole time?

21  A.  That's correct.

22        MR. MAGARIEL:  Move to admit 6 through 8.

23        THE COURT.  Any objection?

24        MS. MCFARLANE:  No objection.

25        THE COURT:  6, 7 and 8 of Defendant's Exhibits

 1    received.

 2    BY MR. MAGARIEL:

 3    Q.   Let's start with six if we could.  And so this is an

 4    instance of the camera being fairly zoomed in and also

 5    potentially panned to the right; is that correct?

 6              THE COURT:  I'm sorry to interrupt.  Let me go back.

 7    We need a better record than we created because we got multiple

 8    sixes, sevens and eights.

 9              MR. MAGARIEL:  I could renumber, judge.

10              THE COURT:  I don't think it's worth that.  If you

11    would just refer to them as I think they're marked.  The

12    government's exhibits are certainly marked as government's

13    exhibit.  Defendant's exhibits are defendant's exhibits.  If

14    you just rephrase your question with that.  And to be clear,

15    the exhibits I just admitted were Defendant's 6, 7 and 8.

16              MR. MAGARIEL:  Thank you, judge.

17    BY MR. MAGARIEL:

18    Q.   To be clear, I'm asking you about Defendant's Exhibit 6.

19    Do you have that in front of you?

20    A.   Yes.

21    Q.   And Defendant's Exhibit 6, is that an instance of the

22    camera being zoomed in?

23    A.   It was, yes.

24    Q.   And is that an instance of the camera panned to the right

25    at least somewhat?

1   A.  Correct.

2   Q.  And can you see there a little right of center it appears

3   to be part of a window through some trees?

4   A.  It does look like that.

5   Q.  And then you can see part of a driveway with it looks like

6   maybe two motorcycles parked there?

7   A.  That's correct.

8   Q.  If we could turn to Defendant's 7, and I think some of

9   these are repetitive with exhibits the government had.  Is this

10  an instance of the camera basically not zoomed in at all and

11  zoomed out as far as it can?

12  A.  That is correct.

13  Q.  And so just so we're clear on the angle that we have here,

14  this camera is pointed to the east?

15  A.  Correct.

16  Q.  And it shows Ruby Avenue?

17  A.  It does.

18  Q.  Fair to say that where this camera is pointed east there

19  are no houses to the left or to the north?

20  A.  Correct.

21  Q.  And then you can't see when the camera is panned all the

22  way out, but Mr. Lucas' house is on the right or to the south?

23  A.  That's correct.

24  Q.  And so I heard you say earlier that there was another house

25  that was to the west and I think to the north of Mr. Lucas'

1    house.  Did you say that?

2    A.   It is as -- as you move west down the road.

3    Q.   So it's behind where this camera was?

4    A.   Correct.  That's correct, yes.

5    Q.   And fair to say fair distance between those houses?

6    A.   Between Mr. Lucas --

7    Q.   Mr. Lucas' house and this white house?

8    A.   That's correct.

9    Q.   Not across the street from each other?

10   A.   Not across the street.

11   Q.   Not -- not even diagonally across the street?

12   A.   That's correct.

13   Q.   And if we could turn to Defendant's 8, and I think this is

14   quite similar to what I was just asking you, but this is the

15   camera zoomed in closely that you said not close enough to read

16   lips but obviously pretty close; is that right?

17   A.   That's correct.

18   Q.   Is one of the things that you did as part of your

19   investigation was to take down cars make, model and license

20   plates?

21   A.   We did.

22   Q.   Did you have a master list of those?

23   A.   We did.

24   Q.   Do you remember how many pages it was?

25   A.   It was a lot, but I don't remember.

1    Q.  I mean, we're not talking five pages?

2    A.  No.

3    Q.  And, in fact, you would sometimes write reports that were

4    for a particular day, and for that particular day you would

5    write a list of make, model, license plates?

6    A.  Correct.

7    Q.  Did you ever count how many you got up?

8    A.  I -- I didn't.  Multiple people assisted with that.  So

9    there was other task force and agents that were doing that.  So

10   it wasn't me writing all those, so I'm not sure.

11   Q.  Fair to say the time period this camera was up it would

12   have been hundreds?

13   A.  I would say that.

14   Q.  But you don't know the exact number?

15   A.  No.

16   Q.  And one instance of what that might have looked like --

17           MR. MAGARIEL:  Judge, if I could approach.

18           THE COURT:  You may.

19   BY MR. MAGARIEL:

20   Q.  I'm handing you what's been marked as Defendant's 1, and it

21   is front and back.  Is this one instance of where you would

22   have been writing down license plates and makes, models of

23   cars?

24   A.  That -- that's correct.

25   Q.  And then on the right -- and, I'm sorry, I didn't ask if

1   you had time to look at this.  Did you have time to look at

2   this?

3   A.  I've seen it before, yes.

4   Q.  I assumed you had.

5       Fair to say on the right you or another investigator in

6   this case would have gotten information who the registered

7   owner was of the car?

8   A.  Yes, that's what that is.

9   Q.  So we see on the right we've got names and addresses of

10  folks I assume based on the car registration?

11  A.  That's correct.

12  Q.  You have the ability as law enforcement to look that up, it

13  looks like, both for Kansas and Missouri?

14  A.  We do.

15  Q.  And then in this particular exhibit, Defendant's

16  Exhibit 1 --

17      MR. MAGARIEL:  I guess I should move to admit.  Move

18  to admit Defendant's Exhibit 1.

19      THE COURT:  Any objection?

20      MS. MCFARLANE:  No objection.

21      THE COURT:  Defendant's 1's received.

22  BY MR. MAGARIEL:

23  Q.  I see a couple of relevant names I want to talk to you

24  about.  About three-fourths of the way down on the front

25  page of it of Defendant's Exhibit 1 I see you wrote down Carol

1   Dobson with an 875 Ruby Avenue address --

2   A.   Yes.

3   Q.   -- related to a Chevy Impala?

4   A.   Yes.

5   Q.   Who is that?

6   A.   I believe that's Ernest Lucas' mother.

7   Q.   And then if we could turn to the top of Defendant's

8   Exhibit 1, still that first page, I see a name William Nowak?

9   A.   Correct.

10  Q.   And that is a relevant name in this investigation; is that

11  right?

12  A.   It was.

13  Q.   Can you explain briefly what you did after you used the

14  pole camera to get the license plate and then the registered

15  owner of the vehicle to connect Mr. Nowak to a larger

16  investigation?

17  A.   We did.  So the license plate on that vehicle we identified

18  as William Nowak.  I'm trying to go back and remember some of

19  this because I haven't reviewed all of this.  We believed he

20  was participating in at least purchasing what we thought was

21  narcotics from the residence.  At one point we made contact

22  with him in the City of Topeka and actually interviewed him at

23  one point at a residence.

24  Q.   And then did he help connect to some co-defendants who are

25  currently charged in this case?

1    A.  I believe he made some admissions that assisted us.  I

2    can't remember exactly what he said because it's been a while

3    since I read that, but I know he -- he did provide some sort of

4    a statement and mentioned some names.

5    Q.  And was one of those names Mr. Allen?

6    A.  I believe so, yes.

7    Q.  And the other one was Mr. Smith I think?

8    A.  I believe that's correct too.

9    Q.  Okay.  And so his statement was I understand maybe not the

10   only piece of evidence, but a piece of evidence that connected

11   others to bring in co-defendants into the case?

12   A.  I would agree with that.

13   Q.  Okay.  All right.  I want to change a little bit and talk

14   to you about Mr. Lucas' address itself.

15   A.  Okay.

16   Q.  I think I heard you say on direct you described this as

17   remote?

18   A.  I would.

19   Q.  And do you remember saying back in March of this year at I

20   think the last grand jury that it was secluded?

21   A.  I think that's a fair word for it as well.

22   Q.  Okay.  Let's talk a little bit and show a few photos of

23   that area.  I'm handing you Defendant's 2, 3, 4, 9 and 10.  If

24   you take a moment and look through those please.

25   A.  Yeah.

1    Q.  Did you get a chance to look through those?

2    A.  Yes, sir.

3    Q.  For -- just to be clear, all of these are Google map images

4    in various forms of either the Ruby Avenue itself, the house,

5    or overhead views of that area; is that fair to say?

6    A.  It is.

7    Q.  Are you familiar with that area?

8    A.  I am.

9    Q.  How -- and you said -- how long have you been an officer in

10   Kansas City, Kansas?

11   A.  2011.

12        MR. MAGARIEL:  Move to admit Defendant's 2, 3, 4, 9

13   and 10.

14        THE COURT:  Any objection?

15        MS. MCFARLANE:  No objection.

16        THE COURT:  Defendant's 2, 3, 4, 9 and 10 are

17   received.

18   BY MR. MAGARIEL:

19   Q.  Let's start with Defendant's 2 if we could.  Does this

20   appear to you to be a Google map street view image of the dead

21   end just past Mr. Lucas' home on Ruby Avenue?

22   A.  It does.

23   Q.  And I say just past.  If you continued to the east on Ruby

24   Avenue past Mr. Lucas' house, is this where you would wind up?

25   A.  It is.

1   Q.  And I think you described that at one point maybe that

2   could have gone through, but going back some period of time

3   it's now a dead end?

4   A.  That's correct.

5   Q.  And there's these large concrete structures that prevent

6   any cars in driving past there; fair to say?

7   A.  Fair to say.

8   Q.  Do you have an idea about how far past Mr. Lucas' house

9   this is?

10  A.  Hundred yards, maybe 150 yards.

11  Q.  I think you've already said this earlier, but there's no

12  through traffic that would be going on Ruby Avenue past

13  Mr. Lucas' house to the east?

14  A.  You're not supposed to.

15  Q.  Okay.  It looks like it would be hard to do?

16  A.  Those Jersey barriers get moved from time to time and there

17  are people that go through there.  Usually it's motorcycles and

18  things like that, four-wheelers, but, yeah, there have been

19  vehicles going through there.  But if it looks like that,

20  they're not getting a vehicle going through there.

21  Q.  And you're not supposed to you said?

22  A.  You're not supposed to.

23  Q.  If we could turn to Defendant's 3.  And so if you turned

24  around from the angle that you saw at Defendant's 2 back

25  looking to the west, is this generally what you would see?

1  A.  Correct.

2  Q.  So now we're on Ruby Avenue and we are looking west.  And,

3  again, this is a Google street view map.  Is this what it

4  appears to you?

5  A.  It does.

6  Q.  I assume you use this for investigative purposes sometimes?

7  A.  I do.

8  Q.  On the left, which I believe is the south, is that

9  875 Ruby?

10  A.  It is.

11  Q.  And then it looks to me somewhat in the middle of this I

12  see two windows on the side of the house.  Do you see what I'm

13  talking about?

14  A.  I do.

15  Q.  And then just below those two windows, does that appear to

16  you to be a garage door?

17  A.  It is.

18  Q.  And then just in front of the garage door, is that a small

19  driveway?

20  A.  It is.  I believe the driveway is just outside the garage,

21  and there's a driveway on the other side of the house on the

22  west side of the house.

23  Q.  So we talked a little bit -- I think you did earlier --

24  well, you talked a little bit with the government earlier about

25  a driveway that curved around to the side.  Is that the

22-20032-01  USA v Ernest Lucas  10.31.23

1   driveway that is -- would -- if you were facing the house to

2   the right, is that what you were talking about?

3   A.  Right where those trailers were backed in, that's what I

4   was talking about.

5   Q.  But there's also a straight shot off the street driveway

6   that would go to that garage?

7   A.  There is.

8   Q.  And is that the view -- the edge of that driveway the view

9   you could see from the pole camera?

10  A.  Right, the edge where those trash cans are at, that's where

11  the driveway would begin.

12  Q.  Okay.  And they're almost sort of on each side of the

13  driveway right in this photo?

14  A.  There's another one too that's kind of the marking on the

15  edge of the driveway.

16          THE COURT:  I'm confused.  Which -- which trash cans

17  is your question meant to inquire about?

18  BY MR. MAGARIEL:

19  Q.  So it looks like at the edge of that driveway there might

20  be a mailbox.  Do you see that?

21  A.  Yeah, I think -- the mailbox -- I'm not sure if that's a

22  trash can next to the mailbox, but the mailbox is where that

23  driveway would roughly start.  And then as you continue to walk

24  to the west where those other trash cans are would be where the

25  driveway would start on the west side.

22-20032-01  USA v Ernest Lucas  10.31.23                          61

1   Q.  And it looks like three items:  two black items on either

2   side of a white item.  Is that what you're talking about is the

3   trash can?

4   A.  Yeah.

5         MR. MAGARIEL:  Was that helpful, judge?

6         THE COURT:  It is.  Thank you.

7   BY MR. MAGARIEL:

8   Q.  All right.  If we could turn to Defendant's Exhibit 4, is

9   this another Google street view image of Ruby Avenue where it

10  intersects with Ferree Street?

11  A.  Ferree.

12  Q.  Thank you.  Ferree Street.

13  A.  Yes, sir.

14  Q.  And so this image is on Ruby Avenue looking west?

15  A.  Looking east.

16  Q.  No, it's east.  Yep, east.  So if I were to go -- so the

17  white house that you were talking about earlier, is that the

18  house there on the left?

19  A.  Correct.

20  Q.  And so if I were to go up this hill to the east, I would

21  pass this house on my left.  And then on my left I would get to

22  the pole in which the pole camera was mounted?

23  A.  Correct.

24  Q.  And then if I went up the hill a little bit more,

25  Mr. Lucas' house would have been on my right?

22-20032-01  USA v Ernest Lucas  10.31.23

1    A.   Correct.

2    Q.   And then if I continued up just a little bit more, I would

3    get to that dead end that we talked about earlier?

4    A.   That's correct.

5    Q.   And then Ferree Street is a street that intersects Ruby

6    here; is that correct?

7    A.   It does.

8    Q.   "Here" I mean at the point where this Google street view is

9    taken?

10   A.   It's the north-south intersecting street from the east-west

11   street of Ruby.

12   Q.   And it T's at this intersection in that Ferree Street does

13   not continue to the south?

14   A.   It does not.

15   Q.   If we could turn to Defendant's 9, and this is a Google map

16   image except that I have added a blue arrow in the bottom

17   right-hand portion of that.  Do you see that blue arrow there?

18   A.   I do.

19   Q.   Is it pointing to Mr. Lucas' property?

20   A.   I believe so, yes.

21   Q.   And so this is oriented north, south, east, west in that

22   north is up on this page?

23   A.   That's correct.

24   Q.   And so we just talked about the intersection of south

25   Ferree and Ruby.  Do we see that intersection here on this map?

22-20032-01  USA v Ernest Lucas  10.31.23                    63

```
 1   A.  We do.  It's about the center of the exhibit.
 2   Q.  And then just to the right of the center, as you just said,
 3   is that that white house that we just viewed in Defendant's 4?
 4   A.  Correct.
 5   Q.  And then again in Defendant's 9, Mr. Lucas' house is there
 6   sort of on the right center part of the image?
 7   A.  Correct.
 8   Q.  And you said this earlier, but fair to say Mr. Lucas' house
 9   is in a wooded area?
10   A.  I would agree with that.
11   Q.  Surrounded by trees to all sides?
12   A.  I would agree with that.
13   Q.  And then this image doesn't show close up.  You can
14   generally see where the street dead ends there on the far right
15   of this view in Defendant's 9?
16   A.  That's correct.
17   Q.  If we could turn to Defendant's 10, this is a similar
18   overhead view of that area; is that right?
19   A.  It is, sir, yes.
20   Q.  The last one used satellite imagery.  This is just a map;
21   fair to say?
22   A.  Fair to say.
23   Q.  And there's another blue arrow.  Is that again pointing to
24   generally where Mr. Lucas' home is located?
25   A.  Yes.
```

22-20032-01  USA v Ernest Lucas  10.31.23

1   Q.  And we see a street intersecting Ruby off Metropolitan.  Is

2   that Ferree?

3   A.  Right, between 10th Street and the word Ruby would be

4   Ferree.

5   Q.  Thank you.

6       I asked you a couple of questions about testifying at a

7   grand jury in March of this year as far as you describing the

8   area as secluded.  Do you remember saying that for us to drive

9   down there and sit on it physically, we would have been

10  identified almost immediately?

11  A.  I believe that's something I would say.

12  Q.  Okay.  And then do you remember continuing and saying:  If

13  you drove to that address, you have to drive down Ruby Avenue

14  to the dead end at his house?

15  A.  Again, that's something I would -- how I would describe it.

16  Q.  Okay.  And I think you sort of said this earlier, but do

17  you remember saying at the grand jury that you put the camera

18  up to prevent us from being identified?

19  A.  That would be a fair statement as well.

20  Q.  And I think you described one time that you tried to do

21  some physical surveillance yourselves, but you had to park a

22  fair distance back to the west in relation to Mr. Webb?

23  A.  Right, yeah, that evening.  And I can't remember exactly

24  where I was at that night, but I was further west, quite a ways

25  west.

1   Q.   And for the reasons that we've talked about because of how

2   remote and secluded Mr. Lucas' home is; is that right?

3   A.   Well, on that particular night, I wasn't even sure where he

4   was at, Mr. Webb.  I just went up to Ruby and saw his lights at

5   the dead end.  So I just kind of stayed back because I could

6   see -- I had advantage of lights.  I could see the lights

7   coming, which gives you a chance to sit a lot further back, but

8   I wouldn't have -- I wouldn't have went all the way down to the

9   east at the dead end.

10  Q.   And you weren't even necessarily there to surveil the house

11  at all?

12  A.   I wasn't at all.

13  Q.   The Ruby house?

14  A.   Not at all.

15  Q.   You were trying to find Mr. Webb?

16  A.   I was trying to arrest Mr. Webb, yes.

17  Q.   Particularly about Mr. Lucas, you testified at a different

18  grand jury in July of 2022.  Do you remember saying that

19  Mr. Lucas was on house arrest?

20  A.   Yes.

21  Q.   And that you saw him, at least you said to the grand jury,

22  every day at the residence?

23  A.   Correct.

24  Q.   So when you went back historically and viewed the pole

25  camera footage, you saw Mr. Lucas at the residence literally

22-20032-01  USA v Ernest Lucas  10.31.23

1   every day?

2   A.   Daily.  I mean, Mr. Lucas spent a lot of time outside in

3   front of his house, so he would spend -- he would be out in the

4   street walking around, working on cars, doing some of the

5   things that we -- the government had did on direct on some of

6   the activity we saw.  So we watched him every day.

7   Q.   And do you remember saying, during that grand jury

8   transcript, that you knew that there were others who lived at

9   the house?

10  A.   Yes, we knew that too.

11  Q.   How about Mr. Lucas' sister?

12  A.   She also lived there.

13  Q.   How did you know that?

14  A.   We would see her, and we identified her car I believe.  And

15  I can't remember exactly what she drove.  I don't want to say

16  something that's not true.  But I remember seeing her there.  I

17  believed his mom lived down the street but would regularly be

18  in and out of the house as well.  Those are the two that I

19  remember just top of my head that I knew frequented that

20  residence.

21  Q.   Do you remember saying at the grand jury that the sister

22  lived in the house in the back room?

23  A.   Yeah.  And I don't remember exactly how we knew that, but I

24  do remember something about remembering that she lived towards

25  the back of that residence.

1   Q.   Okay.  But you weren't investigating her it doesn't sound

2   like?

3   A.   Not -- there wasn't nothing we could link the sister to,

4   any activity.

5   Q.   But obviously because you were surveilling that home 24/7

6   for almost 60 days, you would have seen the sister?

7   A.   Correct, you would start seeing the people who lived at the

8   house obviously.

9   Q.   At a different grand jury your co-case agent, Perez,

10   described what you were able to do through the camera as

11   "allowed us to see the pattern of behavior at Ernie's house."

12   Do you agree with that?

13   A.   I would.

14   Q.   And Agent Perez also said, during that August of 2022 grand

15   jury, as far as cars or vehicles seen, we saw "several

16   different makes and models, I mean, upwards of about 20 or so a

17   day coming in and out."  Would you agree with that?

18   A.   I would.

19   Q.   And that's how we got to that list earlier of hundreds of

20   makes, models, and license plates that you would have gotten

21   through the pole camera?

22   A.   I would -- that's correct.

23   Q.   And then you testified, again, this is the March 2023 grand

24   jury, that there wasn't someone who was sitting in front of a

25   computer or, I guess, a phone to watch the video all day every

1  day?

2  A.  Correct.

3  Q.  There were pieces of time in which someone would do that,

4  and that's maybe you can tell because the camera is panning or

5  zooming; is that right?

6  A.  Right.  If you see that camera move when you -- when you go

7  back and historically review it, somebody's live manipulating

8  that camera.

9  Q.  Okay.  But fair to say no one was watching it 24/7?

10  A.  Nobody was doing that, no.

11  Q.  Okay.  We spoke a little bit about Mr. Nowak and how you

12  used the camera to discover him and then interview him; is that

13  right?

14  A.  Yes.

15  Q.  And then used information from him to further the

16  investigation to bring in Mr. Allen and Mr. Smith; is that

17  right?

18  A.  That's correct.

19  Q.  You also used the pole camera to bring in -- and I think

20  you've already spoken about Mr. Gallegos?

21  A.  Correct.

22  Q.  And then Mr. Borjas?

23  A.  Correct.

24  Q.  I want to talk a little bit about how you were able to do

25  that.  Do you still have the government exhibits there in front

22-20032-01  USA v Ernest Lucas  10.31.23

1   of you?

2   A.   I do.

3   Q.   And I think a couple of these exhibits were about those

4   aspects of the investigation.  So I think Government's

5   Exhibit 7 you've already testified you believed showed

6   Mr. Gallegos and Mr. Lucas.  Mr. Gallegos in the blue; is that

7   right?

8   A.   Yes.

9   Q.   And then on the left of that image is a white truck?

10  A.   Correct.

11  Q.   Is that something that you focused on carefully when you

12  went back and historically reviewed the footage from the pole

13  camera --

14  A.   We did --

15  Q.   -- is that white truck?

16  A.   -- correct.

17  Q.   And, in fact, that white truck is also shown on

18  Government's Exhibit 8 as well?

19  A.   Yes, sir.

20  Q.   And then Government's Exhibit 9 shows I think it was

21  described as a gold Equinox, maybe looks a little silver in

22  this picture?

23  A.   Right, just a little darker than that.  Just looks like

24  that there.

25  Q.   Is that another vehicle that your focus was on?

1   A.  It was.

2   Q.  So you or someone on your investigative team reviews this

3   historic information, and I think, as Agent Perez says, you

4   know, sort of gets this overview of what's happening.  And then

5   as you're making a list of the cars and the license plates, do

6   you focus your attention on the cars that come and go more

7   frequently?

8   A.  Yeah, it just depends on, you know, what each vehicle's

9   doing on -- on kind of which -- how -- how the investigation

10  was steered if that makes sense.

11  Q.  Okay.  But obviously your investigation was steered toward

12  this white truck?

13  A.  Right, the white truck and gold Equinox became two vehicles

14  that we followed up with and began investigating.

15  Q.  But your attention was initially because you saw them

16  through historical footage on the pole camera?

17  A.  Actually not just historic -- well, it was -- I don't

18  remember the exact time I saw it.  It was really early on after

19  the camera was -- was up that we saw the white truck pull up

20  and then Mr. Lucas enter that truck and exit with a bag.  That

21  was -- I don't want to give the exact dates, but it was shortly

22  after the pole cam was up, and that became, as an investigator

23  in narcotics that I have done, something that perked my

24  interest on possibly supplying him.

25  Q.  So, again, you don't need to describe every single thing

1  that you did, and I notice maybe you haven't reviewed this

2  portion, but can you describe generally what you do after you

3  identify these vehicles that you have interest in?

4  A.  Yeah, so we got to first find out who they are.  So on one

5  particular date, we were able to follow that truck.  We were

6  able to get a license plate and do some linking, and identified

7  a business in Kansas City, Missouri.  Did some work and was

8  able to identify Abraham Gallegos as the person we believed was

9  at that shop within that vehicle at times.  And then after

10  identifying Mr. Gallegos, it took some time, but his associate

11  was Mr. Borjas.

12  Q.  And as I understand it, through further investigation you

13  were able to get warrants out of Missouri for GPS tracking

14  devices for both the white truck we've been talking about and

15  the gold Equinox?

16  A.  That is correct.

17  Q.  And you were able to get those warrants, you applied for

18  them and received?

19  A.  We did.  Yes, sir, we got both.

20  Q.  You put tracking devices on the white truck and gold

21  Equinox?

22  A.  We did.

23  Q.  And then obviously you get more information because you

24  have location data related to where the white truck and the

25  gold Equinox are going?

22-20032-01  USA v Ernest Lucas  10.31.23

1  A.  Correct.

2  Q.  Did you use the location data as well as maybe your own

3  surveilling of those vehicles to find additional addresses of

4  interest?

5  A.  We did.

6  Q.  Is one of those 7607 East 65th Street in Kansas City,

7  Missouri?

8  A.  Correct.

9  Q.  And was another 3321 Mersington Avenue in Kansas City,

10  Missouri?

11  A.  That's also correct.

12  Q.  And then did you use a combination of this information and

13  maybe others to get warrants -- search warrants for both of

14  those addresses in Kansas City, Missouri?

15  A.  We did.

16  Q.  And you searched both of those addresses?

17  A.  We did.

18  Q.  And obviously there's evidence that was uncovered from

19  those locations?

20  A.  There was.

21  Q.  And then we spoke about the two names:  Gallegos and

22  Borjas-Madrid.  Did you know -- you knew the name of

23  Mr. Gallegos because you ran information related to the

24  vehicle.  I think you maybe used social media and other things

25  to get that name; is that right?

1   A.  That's correct.

2   Q.  And I said you ran it.  You ran the registration on the

3   vehicle?

4   A.  That's right.

5   Q.  And then you didn't have the name for Mr. Borjas-Madrid

6   even through that work?

7   A.  That took some time to identify him.

8   Q.  But you were able to identify him after executing the

9   search warrant on those two addresses on Mersington and 65th

10  Street?

11  A.  That's correct.

12  Q.  And then those are other co-defendants that are charged in

13  this case; is that right?

14  A.  They are.

15      MR. MAGARIEL:  I don't know if there's a point the

16  court wants to take a break or wants me to keep going.  I got

17  some time left; I can do either or.

18      THE COURT:  Do you have any other choice?

19      MR. MAGARIEL:  I don't understand.

20      THE COURT:  I'm trying to understand where we're going

21  on this.  We covered a lot about the broader investigation.

22  This motion -- I've given you all the room I can give you, but

23  how much longer do we have on every aspect of this

24  investigation?

25      MR. MAGARIEL:  Not a ton, judge, maybe 15 more

1   minutes.

2           THE COURT:  Let's try and push through.

3           MR. MAGARIEL:  Okay.  May I approach?

4           THE COURT:  You may.

5   BY MR. MAGARIEL:

6   Q.  I'm handing you what's been marked as Defendant's

7   Exhibit 5.  Have you seen that before?

8   A.  I have, sir, yeah.

9   Q.  And is this an instance of phone location data that you

10  would have received based on Mr. Hicks' phone?

11  A.  That is correct.

12  Q.  And this image was in a larger report that I think you

13  created; is that right?

14  A.  Yeah.  We would snip these often, so yeah.

15  Q.  So at some point in relation to your investigation of

16  Mr. Hicks, you got GPS location data from his phone?

17  A.  We did.

18  Q.  Okay.  Do you remember when you started getting that?

19  A.  I believe it was April the 16th.

20  Q.  Of '22?

21  A.  Of '22.  Something around mid April right there.

22  Q.  And so from April 16 on Mr. Hicks, assuming that he had his

23  phone with him, you all had location data for him?

24  A.  Correct.

25  Q.  Do you remember being involved in a controlled buy from

```
1    Mr. Hicks on April 21?

2    A.  On May 21st?

3    Q.  I think April 21.

4    A.  Oh, April 21, yes.

5    Q.  And during that controlled buy, do you remember that

6    Mr. Hicks told the undercover that he "kind of always stays

7    with it?"

8    A.  Yes.

9    Q.  And was the understanding of that to mean that he keeps

10   drugs on him to sell so that he can fairly immediately be

11   available to sell drugs to folks?

12   A.  That's the way the undercover understood it and as well I

13   would probably understand the same.

14   Q.  Okay.  And on this particular buy on April 21, you would

15   have had location data for Mr. Hicks?

16   A.  We did.

17   Q.  And in this particular instance, the locations that you

18   knew he was at were a car wash on Merriam Lane, and he met the

19   undercover for the buy at a Waffle House on Kansas Avenue; is

20   that right?

21   A.  He did.

22   Q.  There was another --

23        MR. MAGARIEL:  Before I forget, I don't believe I

24   moved to admit Defendant's Exhibit 5.

25        THE COURT:  You're moving now?
```

1    MR. MAGARIEL:  I am.

2    THE COURT:  Any objection to 5?

3    MS. MCFARLANE:  No objection.

4    THE COURT:  Defendant's 5's received.

5    MR. MAGARIEL:  Thank you.  Sorry about that.

6    BY MR. MAGARIEL:

7    Q.  On April 28 was there another controlled buy involving

8    Mr. Hicks?

9    A.  There was.

10   Q.  And during that controlled buy, he was surveilled as being

11   at an address at 2804 Sewell, S-e-w-e-l-l, Avenue?

12   A.  He was at that address that afternoon.  I believe he left

13   around two o'clock in the afternoon.  That was an address that

14   we identified I believe after the 21st -- some time between the

15   21st into the 28th of April that we believed he likely was

16   staying at.  It was an apartment.  And we actually had pretty

17   decent pings up there.  They were 600 meters.  We were able to

18   locate some vehicles and physically see him there at one point.

19   Q.  As it relates to the undercover talking to Mr. Hicks about

20   purchasing meth, during this particular controlled buy on

21   April 28, Mr. Hicks told the undercover, "I'm always good."  Is

22   that right?

23   A.  Correct.

24   Q.  And that, again, was similar to, yes, I'm ready and able to

25   sell methamphetamine whenever you like?

1  A.  I would agree with that.

2  Q.  And then, again, you surveilled Mr. Hicks going to that

3  same Waffle House on Kansas Avenue?

4  A.  When he got there.  We didn't follow him to the Waffle

5  House from anywhere.  We didn't know where he was at exactly.

6  Q.  Okay.  And so for either of these controlled buys on

7  April 21 or April 28, either from what Mr. Hicks told

8  undercover, what your GPS data showed, or where you physically

9  saw him, none of that was at Mr. Lucas' house?

10  A.  Well, I will say this, and I will be super careful how I

11  say it, because we never saw him come to or from Ernie Lucas'

12  on those dates because we didn't know he was coming from his

13  house.

14      Historically reviewing these pings, he did ping -- in

15  Defendant's Exhibit 5, he did pings -- which was May the 25th,

16  he did ping in that exact area on those dates at some point,

17  but we had no camera to say he was at Mr. Lucas' house.  But he

18  was in the same area as where when -- when Chaz Hicks pinged at

19  this position on Government's Exhibit 5 almost --

20  Q.  Defendant's 5.

21  A.  Defendant's 5.

22      We would see the camera outside of Mr. Lucas' house and we

23  would see Chaz Hicks there.  I can tell you Chaz Hicks pinged

24  in this same area those dates, but I could never say for sure

25  if he was at Lucas' house because we could never verify it on

1   camera.  Does that make sense?

2   Q.   You say he pinged on April 21 and April 28?

3   A.   21, 28 and later on on May the 10th as well.

4   Q.   But then you -- well, you didn't have the -- the cameras on

5   April?

6   A.   I couldn't verify; that's what I'm trying to say.

7   Q.   I see.

8   A.   I'm being careful saying that because, you know,

9   3,339 meters is the ping.  But I can't say for sure he wasn't

10  there, but I can't say for sure he was there if that makes

11  sense.

12  Q.   Where -- where is all the ping data?  Is it still -- do you

13  still have it?

14  A.   Oh, yeah, it's in discovery, sir.

15  Q.   Okay.

16  A.   It's all there.

17  Q.   When, on those particular days, did he ping near

18  Mr. Lucas' house?

19  A.   I believe it was in the afternoon hours on both, but I

20  don't remember exactly.

21  Q.   Did he ping right before he went to go do the controlled

22  buy?

23  A.   I believe two of the occasions was before.  I don't know if

24  it was right before, but it was some time before.  And then if

25  I remember right, May 10th was after.  He wasn't there before

1  the May 10th one, some time in the evening hours I believe.

2  Q.  Okay.

3  A.  But, again, we didn't see him on camera to verify hundred

4  percent that he was at that house.

5  Q.  Well, yeah, you installed the camera on the day after

6  May 10?

7  A.  Correct, yeah.

8        MR. MAGARIEL:  Judge, can I have a moment?

9        THE COURT:  You may.

10 BY MR. MAGARIEL:

11 Q.  Very briefly, you say you saw Mr. Hicks on the surveillance

12 I think both at the Ruby address and at a different address; is

13 that right?

14 A.  On what day are we talking here, sir?

15 Q.  Just in general.

16 A.  We saw him up on Sewell.  Yeah, we saw him -- I want to say

17 the 28th we saw him.  I think Special Agent Perez watched him

18 leave that address at two o'clock -- 2:06 I think is what comes

19 to mind in my head.  And then later on a different date, I

20 think it would have been early May, we saw him at that address,

21 because he discarded some trash in a trash can on Sewell.  So

22 those -- 875 Ruby and then we seen him on Sewell with physical

23 surveillance.

24 Q.  And you did not see him on another pole camera at another

25 location?

1  A.  No, he -- I never saw him over in Missouri at any other

2  addresses, no.

3  Q.  Okay.  On -- at the Sewell address or on various dates on

4  the pole camera at Ruby, did you see Mr. Hicks with that red

5  and black backpack that's described in the search warrant?

6  A.  We did.  We saw him with the red and black bag on Ruby

7  before the May 25th documented in the warrant, but we also saw

8  him on Sewell I think one time with that red and black bag as

9  well if I remember reading the report right, which I think that

10  I am.

11  Q.  It appeared that he carried that fairly regularly; is that

12  right?

13  A.  It is.  And if it wasn't that one, it was another bag at

14  some sort at times I think.

15          MR. MAGARIEL:  That's all I have.  Thank you.

16          THE COURT:  Any redirect?

17          MS. MCFARLANE:  Your Honor, not for purposes of the

18  suppression issue.  If we move to the *Franks* issue, I'll have

19  some follow-up questions based upon the cross-examination, but

20  at this point I don't have any questions about the pole camera.

21          THE COURT:  You may step down, sir.

22          Does the government have additional evidence on the

23  suppression issue?

24          MS. MCFARLANE:  Not at this time, Your Honor.  Thank

25  you.

22-20032-01   USA v Ernest Lucas   10.31.23                    81

 1          THE COURT:  Does the defense wish to present evidence

 2    on the suppression issue?

 3          MR. MAGARIEL:  No, Your Honor.

 4          THE COURT:  So tell me in your mind as the movant,

 5    Mr. Magariel, what is the framework the court will take from

 6    this evidence as you perceive the issues?

 7          MR. MAGARIEL:  Judge, the reason that I went into some

 8    of the detail about other aspects of the investigation is the

 9    pole camera did way more in this case than what officers could

10    have done absent.

11          Obviously you've already heard from Detective Blackman

12    that they physically could not have done surveillance because

13    of the setup in that area.  They would have been -- they would

14    have been caught and seen immediately.  And then they didn't

15    even have the resources -- or they didn't use the resources

16    maybe to have someone physically sit and watch the video all

17    day.

18          They could go back historically, search on days.

19    There were instances where -- where agents were actually

20    accessing it, but generally they were just going back and

21    searching a date and a time or a range.

22          And so, for example, I used bringing in all the

23    different co-defendants I think into this case.  All of that

24    was uncovered by the pole camera in ways in which I don't think

25    it could have happened with individuals just surveilling, you

1   know.

2          THE COURT:  What does that have to do with this

3   defendant's motion?

4          MR. MAGARIEL:  Judge, I think because of the

5   technology that's at issue here, under *Carpenter* and *Jones,*

6   that because of the combination of an intrusion onto his

7   property and because of the use of technology, I think those

8   two things combined is what raises the -- the privacy issues

9   here, and so that's why I'm talking a little bit about what the

10  technology could do that others couldn't.

11         You know, it's watching his house 24/7.  He's on house

12  arrest, so he -- it's basically watching every single person

13  who interacts with him.  It's recording their license plates,

14  allowing investigators to then go find out who these people

15  are, interview them, bring in co-defendants.

16         I want to talk about briefly one of the exhibits,

17  which is Defendant's 3, and this is on the curtilage issue that

18  we discussed somewhat in the reply.  That driveway that the

19  camera captures is right up to the garage and the house on

20  Ruby.  And so, you know, I understand there was some

21  description of there's some other driveway that's around the

22  corner that goes up to those --

23         THE COURT:  I understand which driveway you're

24  referencing.

25         MR. MAGARIEL:  And so this is quite close to

1    Mr. Lucas' house.  I mean, I think this is fairly clearly

2    curtilage, and the camera is clearly accessing that.  And a lot

3    of what you see just in the images that the government provided

4    that we have is activity that's occurring on his driveway I

5    think just feet away from the garage door and from the house.

6                 THE COURT:  And feet away from a public street.

7                 MR. MAGARIEL:  That is true, judge.

8                 And so our position is it's a combination of factors

9    here.  It's that they're using, you know, a pole camera that's

10   recording all this information.  They are doing it 24/7 while

11   Mr. Lucas is on house arrest and can never leave his home.

12   They are obviously recording and able to search everything over

13   a period of time.  It's using cell phone data to allow them to

14   access that at any place anywhere in the country, which is

15   something that obviously investigators on their own could not

16   do.  That amounts to a privacy violation.  There's no search

17   warrant.

18                 And so our position is, under the Tenth Circuit

19   authority, the court should excise everything from the pole

20   camera, which I think is almost everything in the warrant

21   except for two instances the government points out, which

22   leaves very little.  And we're asking the court to suppress the

23   fruits, which is, again, most of the investigation.

24                 THE COURT:  I think I understand your position

25   argument.  So my question, to come back to it, is in your view

```
 1    should the court now go decide the suppression issue and

 2    conclude -- define the parameters of that ruling as informative

 3    of the Franks issue?

 4             MR. MAGARIEL:  I think the court can, yes.

 5             THE COURT:  What's the other option?  And I -- if you

 6    think there's a more efficient way to do it, I certainly am

 7    open to it.

 8             MR. MAGARIEL:  Just to make -- make sure I understood

 9    what the court is asking, is the court saying is the most

10    efficient way to proceed through this is to decide the pole

11    camera issue?  Obviously if we succeed, then that likely

12    necessitates us moving on to the Franks issue.  And if the

13    court denies it, then maybe we've simplified the process and we

14    don't need to go further.

15             THE COURT:  Your question is better than mine, yes.

16             MR. MAGARIEL:  Okay.  I think that's a fair way to

17    proceed, judge.

18             THE COURT:  Okay.  Do you agree?

19             MS. MCFARLANE:  Yes, Your Honor.  And I think based

20    upon the way that the Franks issue is argued by the defendant,

21    that's -- that deciding the motion to suppress is the only way

22    to proceed, because the Franks issue doesn't touch anything

23    that's -- that's covered by the pole camera evidence.

24             THE COURT:  Okay.  All right.  Then what I will do is

25    go to work -- do you want to submit any more briefing on the
```

 1   pole camera suppression issue, either side?

 2             MR. MAGARIEL:  Judge, could I have just a moment?

 3             THE COURT:  Yeah.

 4        (Counsel conferring with the defendant.)

 5             MR. MAGARIEL:  Judge, I don't have any briefing I want

 6   to submit.  Mr. Lucas wants me to let the court know something,

 7   and I can explain it.

 8             THE COURT:  Of course.

 9             MR. MAGARIEL:  I have provided Mr. Lucas with the

10   discovery in this case absent the pole camera footage.  I did

11   that some time ago.  I know he has been quite limited in his

12   ability to access it.  There was a period of time when he could

13   have done it a little bit more freely.

14             THE DEFENDANT:  Two hours the last 60 days.

15             MR. MAGARIEL:  But he's been -- and I know the court

16   has heard this.  I sat in the courtroom while other lawyers

17   have raised this.  He's been largely locked down at USP

18   Leavenworth.  He just said he had two hours of access over the

19   last 60 days.  I know other lawyers have raised this issue to

20   the court:  inability to access discovery and to review the

21   case.

22             I did not initially provide the pole camera footage to

23   Mr. Lucas.  I didn't initially have it.  I got it a while back.

24   And to be honest with the court, we have a policy in our office

25   that we're not supposed to provide discovery to the jail when

1    we don't know what's on the discovery.  And so I have

2    personally reviewed a fair chunk of the pole camera, and I also

3    retained outside assistance because, as you heard, it's almost

4    two month's worth of 24/7 recording, and my ability to sit in

5    my office for that period of time is low.

6              THE COURT:  You didn't have a spare two months?

7              MR. MAGARIEL:  I did retain a paralegal to assist

8    reviewing that footage to make sure there was nothing on it

9    that I was putting into the jail that could have been

10   problematic.  We have completed that review, and I believe I

11   can provide that to Mr. Lucas, and I intend to do so.  I would

12   have done it the last couple of days, but my paralegal is ill.

13   And so I haven't gotten it to him yet, but I'm optimistic I'll

14   get it to him this week.

15              He wanted me to let the court know that he has not had

16   the pole camera footage.  I don't know -- part of that is on

17   me.  And I explained why I didn't provide it to him

18   immediately.  I think I -- I think that's what I'm supposed to

19   do.  It did take some time to get someone to review all that

20   because of how extensive it was, and part of that is just

21   logistical stuff.

22              But he also wanted the court to know his limited

23   opportunities to review discovery in the case and wanted to put

24   those issues before the court today, and so I thought I would

25   summarize those.

1          THE COURT:  Thank you.  So knowing that he has, I

2     guess, issues or concerns on that front strikes me there's a

3     couple of ways to go forward.  I can take and decide the motion

4     on the record that exists now or I can postpone that ruling

5     until the defendant believes he's had adequate access.

6          And I don't know whether the gist of the relayed

7     message is he's not happy with the amount of access he's had to

8     the pole camera footage.  If you're asking me to sit on this

9     ruling until he has adequate access, that's one way to go, but

10    it's kind of a -- I can't remember the word -- I can only do

11    one of them.  I can't do both of them.

12         (Counsel conferring with the defendant.)

13         MR. MAGARIEL:  Judge, he's comfortable letting the

14    court decide based on the record here.  If obviously for some

15    reason he gets that and something new comes up and the court

16    hasn't decided, I will approach the court and let the court

17    know that he's changed his mind on that.  But he's told me

18    today he's comfortable moving forward.

19         I think he wanted to put that on the record here

20    because he knows this may end up somewhere else about those

21    limitations, but he's -- he's comfortable letting the court

22    decide the issue on the record that's before it.

23         THE COURT:  Is that right, Mr. Lucas?

24         THE DEFENDANT:  Yes, I just want it on the record so

25    later for appealability.  I know it's going to go a lot farther

1   than this, and the way synergism and my subject right to

2   privacy is without a doubt -- undoubtedly anybody in America

3   would -- the points I'm going to show --

4         THE COURT:  Let me just -- let me just ask you --

5   yeah, did what Mr. Magariel accurately --

6         THE DEFENDANT:  Yes.

7         THE COURT:  Thank you.  So I'll go to work on the

8   ruling and we'll consider -- did you want to submit any

9   additional briefing?

10        MS. MCFARLANE:  Your Honor, I don't have any

11  additional briefing.  I didn't know if there was anything based

12  upon -- I read the defendant's reply.  I didn't know if there

13  was anything based upon that that the court wanted me to

14  clarify further.

15        THE COURT:  It was really a question I had.  I don't

16  have anything in mind.  So I will take it on the evidence and

17  the briefing that's been submitted, decide this suppression of

18  the pole camera footage, get you that order and likely schedule

19  you to come back shortly after that for a status to figure out

20  is there a next step and what does it look like.

21        Before we leave the access to discovery issue,

22  Mr. Magariel, I'm concerned about these reports I continue to

23  receive.  Obviously pretrial detainees have a right to

24  participate in the preparation of their defense.  I don't have

25  granular information on what happened when or didn't happen.

1   But if this reaches a point where it's your considered view

2   based upon the information the defendant is providing you that

3   you want to challenge what's going on as it pertains to him at

4   Leavenworth in the preparation of his defense, you're going to

5   need to provide a motion to the court so I will have a means to

6   take that up.  I've said that to others.

7        I am concerned.  I'm not willing to just get involved

8   based on one-sided oral reports which may be a hundred percent

9   accurate, but I'm not going to go forward on that kind of

10  record.  So if, in your judgment, that issue needs to be

11  raised, you need to start that ball.

12       I'm prepared to give you an oral ruling on the motion

13  to dismiss Document 104 and I'll -- I think that -- and I don't

14  think that outcome's going to surprise anybody, but I'll

15  address that now.

16       This is the ruling on Mr. Lucas' motion to dismiss

17  filed on September 19th of 2023 in Document 104.  It moves to

18  dismiss Count 9 which charges a possession of firearm while a

19  convicted felon which accuses Mr. Lucas of violating

20  Section 922(g)(1) of Title 18.  The motion is made relying on

21  criminal procedure Rule 12(b)(3).

22       In summary terms, Mr. Lucas' motion asserts two

23  grounds for the dismissal.  He seeks, first, that 922(g)(1)

24  fails the test articulated in the *Bruen* decision from the

25  Supreme Court, and then, secondly, it violates the -- the

1    charge violates the commerce clause -- the charge under that

2    provision and that provision violates the commerce clause.

3    I'll address these separately.

4          First on the *Bruen* issue, more specifically Mr. Lucas

5    argues in his motion that 922(g)(1) violates the Supreme

6    Court's new test for firearms laws.  And this motion I've been

7    referring to by shorthand the *Bruen*, of course this is the

8    New York State Rifle and Pistol Association challenge reported

9    at 142 Supreme Court 2111.

10          Our circuit addressed this issue in the *Vincent*

11   *against Garland*, 840 F.4th 1197.  There in *Vincent* the Tenth

12   Circuit explained that *Bruen* articulated a new test for gun

13   laws.  *Bruen* did not indisputably and pellucidly abrogate

14   existing circuit precedent.

15          The circuit precedent referenced by the *Vincent* case

16   is the *United States against McCane*, M-c-C-a-n-e.  There our

17   circuit held that 922(g)(1) doesn't violate the Second

18   Amendment.  With *McCane* now reaffirmed after *Bruen* by the

19   *Vincent* decision, the court rejects Mr. Lucas' argument that

20   922(g)(1) violates the Second Amendment to the Constitution.

21          I appreciate Mr. Lucas' candor acknowledging the --

22   the unavoidability of this outcome given circuit precedent, and

23   notes that Mr. Lucas explicitly recognized that he needed to

24   raise the issue to preserve his challenge for possible appeal.

25          Second, turning to the commerce clause argument that

1    the defendant makes in his motion, this argument contends that

2    the court should dismiss Count 9 of the indictment, the charge

3    under 922(g)(1), because it violates the commerce clause.

4    Specifically the defendant argues that Congress exceeded the

5    permissible scope of its commerce clause authority when it

6    enacted 19 -- I'm sorry, 922(g)(1).  Again, to his credit,

7    Mr. Lucas acknowledges the Tenth Circuit precedent requires the

8    court to deny his motion based on this argument.

9           In 1977 the Supreme Court's decision in the

10   *Scarborough* case, the court assumed there that Congress could

11   regulate firearm possession solely because the firearm

12   previously had moved across state lines.  Our circuit upheld

13   the constitutionality of 922(g) and similar restrictions in the

14   face of commerce clause challenges.

15          Many times -- I won't cite all the cases, simply

16   direct the record to *Goines*, G-o-i-n-e-s, *Campbell* reported at

17   603 F.3rd, 1218, *McCane* which I -- I referenced earlier, and

18   the *Urbano*, U-r-b-a-n-o, decision from 2009.  The court thus

19   denies Mr. Lucas' commerce clause argument and denies his

20   motion to dismiss in Document 104.

21          Counsel, I don't intend to write an order

22   memorializing the result I've announced here, but I do want to

23   make sure I've addressed all the arguments that are made by the

24   motion to dismiss.

25          Mr. Magariel, if you believe I've left some aspect of

22-20032-01  USA v Ernest Lucas  10.31.23

1    the motion unaddressed, I'd appreciate knowing that.

2              MR. MAGARIEL:  I don't believe so, judge.

3              THE COURT:  Is there anything else we can do this

4    morning that will assist the efforts to narrow the issues in

5    the case, Ms. McFarlane?

6              MS. MCFARLANE:  I don't believe so, Your Honor.

7              THE COURT:  Mr. Magariel?

8              MR. MAGARIEL:  No, judge.  Thank you.

9              THE COURT:  Thank you very much.  I'll take the

10   suppression issue under advisement and plan to have a ruling to

11   you within the 30 days recognized by the act.  Planning to see

12   you again at a status conference shortly after that ruling to

13   figure out where next.

14             All right.  Thanks so much.

15        (Proceedings adjourned.)

16

17

18                       CERTIFICATE

19        I certify that the foregoing is a true and correct

20   transcript from the stenographically reported proceedings in

21   the above-entitled matter.

22        DATE:  February 22, 2024

23

24                  /s/Kimberly R. Greiner
                  KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
                  United States Court Reporter

25